UNITED STATES, Appellant,

v.

Todd C. PADGETT, Seaman Apprentice,
U.S. Coast Guard, Appellee.

No. 97–5004.
Crim.App. No. 1060.

U.S. Court of Appeals for
the Armed Forces.

Argued March 31, 1998.

Decided Aug. 13, 1998.

For Appellant: *Lieutenant William G. Rospars* (argued); *Lieutenant Commander Brian F. Binney* (on brief).

For Appellee: *Lieutenant Richard R. Beyer* (argued); *Lieutenant Sandra K. Selman.*

*Opinion of the Court*

GIERKE, Judge:

A military judge sitting as a general court-martial convicted Seaman Apprentice (SA) Padgett, pursuant to his pleas, of willfully disobeying an order from his commanding officer, violating an order of the Coast Guard Station Commander, and committing indecent acts with a female under 16 years old, in violation of Articles 90, 92, and 134, Uniform Code of Military Justice, 10 USC §§ 890, 892, and 934, respectively. The military judge sentenced Padgett to a bad-conduct discharge, confinement for 2 years, total forfeitures, and reduction to the lowest enlisted grade. In accordance with a pretrial agreement, the convening authority disapproved the forfeitures, reduced the period of confine-

ment to 12 months, and approved the bad-conduct discharge and reduction in grade. The Court of Criminal Appeals dismissed Charge I and its specification alleging a violation of Article 90, affirmed the remaining findings of guilty, and reassessed and affirmed the sentence. 45 MJ 520.

The General Counsel of the Department of Transportation, acting in her capacity as Judge Advocate General of the Coast Guard (Art. 1(1), UCMJ, 10 USC § 801(1)), certified the following issues to this Court:

I

DID THE COURT OF CRIMINAL APPEALS ERR BY HOLDING THAT AN ORDER TO A 25-YEAR-OLD MALE SERVICEMEMBER TO TERMINATE HIS "ROMANTIC" RELATIONSHIP WITH A 14-YEAR-OLD FEMALE DID NOT HAVE A VALID MILITARY PURPOSE, AND BY DECLARING THAT ORDER TO BE UNLAWFUL?

II

HAVING DECIDED THAT CONCERN FOR THE REPUTATION OF THE MILITARY COMMAND IN THE COMMUNITY IS GENERALLY A VALID MILITARY PURPOSE, DID THE COURT OF CRIMINAL APPEALS APPLY THE WRONG STANDARD OF REVIEW TO DETERMINE IF THERE WAS A VALID CONCERN FOR THE REPUTATION OF THE MILITARY UNIT IN THIS CASE?

III

DID THE COURT ERR BY MISAPPLYING THE LAW AS IT RELATES TO ORDERS ISSUED TO PREVENT CRIMINAL CONDUCT?

For the reasons set out below, we answer these questions in the affirmative.[1]

---

1. We heard oral argument in this case at the United States Coast Guard Academy, New London, Connecticut, as part of our Project Outreach. *See* 45 MJ 126 n. 1 (1996).

*Facts*

The relevant facts were set out in a stipulation of fact introduced at trial. In late October or early November 1994, SA Padgett and LB, a 14–year–old girl, began a romantic relationship. LB told Padgett that she was 17 years old. Approximately 3 weeks later, LB's mother found out about the relationship and went to Padgett's ship, the United States Coast Guard Cutter WHITE LUPINE (WLM 546), and informed the Officer of the Day (OOD) that she wanted the relationship ended. LB's mother informed the OOD that her daughter had lied to Padgett about her age, and that she was concerned that her daughter was only 14 and Padgett was 25 years old. The OOD informed the ship's captain, Chief Warrant Officer (CWO–2) Dilger, of the conversation. CWO–2 Dilger had been unaware of the relationship.

On or about November 20, 1994, CWO–2 Dilger informed Padgett that LB was under 16 years old, and he ordered Padgett "not to see [LB], not to talk to her, not to call her, not to have any type of relationship with her, not to be friends with her." CWO–2 Dilger did not tell Padgett how long the order would remain in effect. Padgett complied with the order until January 14, 1995.

At approximately 3:00 a.m. on January 14, Padgett returned to his ship, where he met LB and her 13–year–old friend, JC, who had come aboard in the early evening of January 13. The three left the WHITE LUPINE and drove to Coast Guard Station Rockland, Maine, in Padgett's truck. At the Coast Guard Station, Padgett let LB and JC into his barracks through a rear door. They went to Padgett's room and began to watch television. While in the room, LB kissed Padgett, unzipped his trousers, and fondled his genitals. At some time thereafter, JC performed fellatio on Padgett.

Based on the foregoing facts, SA Padgett was charged with willful disobedience of CWO–2 Dilger's order, violating the Coast Guard Station Commander's order prohibiting visitors in barracks after taps, and committing indecent acts with JC. At trial SA Padgett moved to dismiss the specification, alleging willful disobedience of CWO–2 Dilger's order, on the ground that it was too broad and had no military purpose. The military judge denied the motion to dismiss, finding a military purpose in preventing Padgett from violating the law, preserving the Coast Guard's good reputation with the community, accommodating LB's mother's concerns about her daughter, and "taking care of our people, which includes [SA] Padgett." Regarding the scope of the order, the military judge construed the order as terminating the ongoing romantic relationship and prohibiting Padgett and LB from being seen in public "as a couple," but not prohibiting incidental contacts or conversations.

After the motion to dismiss was denied, Padgett entered conditional pleas of guilty to this specification and unconditional pleas of guilty to the remaining Charges and specifications. See RCM 910(a)(2), Manual for Courts–Martial, United States (1995 ed.). By his conditional pleas, provided for in the pretrial agreement, he reserved the right to challenge the validity of CWO–2 Dilger's order on appeal. The military judge approved the conditional pleas of guilty.

The Court of Criminal Appeals set aside the conviction of willful disobedience. The court found that the order was given to "backstop a mother's efforts to correct the habits of her apparently wayward 14–year–old daughter," to "protect [SA Padgett's] best interests and to prevent possible future criminal conduct on his part," and to maintain "a positive public image within the surrounding community." 45 MJ at 523.

Regarding the first purpose, the court opined, "While we sympathize, it is not the role of the military to employ its authority to achieve a private, non-military end for an individual having absolutely no connection to any of the armed forces." Regarding the second purpose, the court found CWO–2 Dilger's motives "laudable" but his method "impermissible," citing *United States v. Wilson,* 12 USCMA 165, 30 CMR 165 (1961) (order "not to indulge in alcoholic beverages" invalid). Regarding the third purpose, the court recognized that "keeping the reputation of a military unit free from disrepute is a valid military concern." *Id.* at 523–24.

276

The court found it "troubling," however, that "the exact nature of the 'romantic' relationship ... was never fully ascertained." The court expressed doubt "that a non-sexual, romantic relationship, even between a 25–year–old Coast Guardsman and a 14–year-old female, constitutes anything more than poor judgment." The court opined that, "[w]ithout having better determined the true nature of the relationship, we do not feel the order can be justified on the basis of preserving the command's repute within the local community." Accordingly, the court concluded: "Not finding a sufficient and reasonable nexus between the order and a military need, we find the order to be illegal." *Id.* at 524.

*Discussion*

The certified questions challenge the legal basis for the court's conclusion. The Government asserts that the Court of Criminal Appeals committed three errors in holding that the order was invalid. First, the Government asserts that the court below misapplied the "rational relation" inquiry by focusing on the facts known to the commander rather than the purpose of the order. The Government points to language in the court's opinion holding that the order could not be justified because CWO–2 Dilger had not "fully ascertained" the "exact nature" of the relationship between SA Padgett and LB, and that the order could not be justified "[w]ithout having better determined the true nature of the relationship." Reply Brief at 3 n. 8, quoting 45 MJ at 524.

Second, the Government asserts that the court below required the commander "to establish some quantum of evidence—probable cause, reasonable suspicion, a preponderance or clear and convincing evidence—to justify the order, rather than requiring the accused to show that the order was an abuse of [CWO–2 Dilger's] discretion." Final Brief at 10.

Third, the Government asserts that the court below erred by relying on precedents "involving orders given to protect servicemembers from their own general propensities to engage in misconduct" and "ignoring

the fact that in this case the order was given to deter the threat of unlawful harm against another identified individual." *Id.* at 14.

Appellate defense counsel respond to the first certified question by arguing that the Court of Criminal Appeals correctly analyzed the specific facts of this case to determine whether the order was lawful. They argue that because "romantic" can mean many things, both lawful and unlawful, a case-by-case analysis is required to determine if there was a valid military purpose for prohibiting the conduct at issue.

The defense responds to the second certified question by arguing that the court below exercised its factfinding power to determine if there was a valid concern for the reputation of the military in this case, and that the court's factfinding should not be disturbed unless it is unsupported by the record or clearly erroneous.

The defense responds to the third certified question by asserting that the court below is entitled to a presumption that it correctly applied the law unless the record shows the contrary.

The concept of "military purpose" for an order is described in paragraph 14c(2), Part IV, Manual, *supra*, as follows:

The order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service. The order may not, without such a valid military purpose, interfere with private rights or personal affairs.[2]

In *United States v. Nieves*, 44 MJ 96, 98 (1996), this Court held that an order is presumed to be lawful and is disobeyed at the subordinate's peril. *See also Unger v. Ziemniak*, 27 MJ 349 (CMA 1989). This Court has long recognized, however, that an order purporting to regulate personal affairs is not lawful unless it has a military purpose. In *United States v. Milldebrandt*, 8 USCMA

2. This paragraph is identical to the same numbered paragraph in the Manual for Courts-Martial, United States (1994 ed.), which was in effect at the time of the offenses.

635, 639, 25 CMR 139, 143 (1958), with Judge Latimer writing the lead opinion and Chief Judge Quinn and Judge Ferguson concurring in the result, this Court struck down as invalid an order requiring a soldier to submit weekly reports on his financial status. Judge Latimer noted that the order "was not required to maintain the morale, discipline, or good order of the unit or to keep the military free from disrepute." *Id.* at 638, 25 CMR at 142. This Court's recognition that military orders may be used to "keep the military free from disrepute" was consistent with Congress' legislative recognition of the need to protect the reputation of the military by criminalizing conduct that is "of a nature to bring discredit upon the armed forces." Art. 134.

This Court addressed the problem of an overly broad order in *United States v. Wysong*, 9 USCMA 249, 26 CMR 29 (1958). There, this Court set aside a conviction of disobeying an order "not to talk or speak with any of the men in the company concerned with this investigation except in line of duty." *Id.* at 250, 26 CMR at 30. This Court held that the order was too broad, vague, and indefinite. The decision was based on the breadth of the order, not its purpose. The Court remarked that "if the order had been narrowly and tightly drawn and was 'so worded as to make it specific, definite, and certain' it might well have been sufficient to support a conviction." *Id.* at 251, 26 CMR at 31, quoting *Milldebrandt.*

In *United States v. Wilson*, 12 USCMA 165, 30 CMR 165 (1961), this Court set aside a conviction of disobeying an order "not to indulge in alcoholic beverages." *Id.* at 166, 30 CMR at 166. Again, the basis for the Court's decision was the broad scope of the order. Citing *Wysong*, this Court held that "an order which is so broadly restrictive of a private right of an individual is arbitrary and illegal." *Id.* at 166–67.

On the other hand, in *United States v. Blye*, 37 MJ 92 (1993), this Court upheld a conviction for disobeying an order "not to drink any alcoholic beverages." *Id.* at 94. The Court distinguished *Wilson* on the ground that Lieutenant Blye was in pretrial restriction when the order was given and that refraining from drinking alcoholic beverages was one of the conditions of the pretrial restriction.

Starting with *United States v. Womack*, 29 MJ 88 (1989), this Court took a somewhat different approach to issues involving the breadth of an order, examining the specific conduct at issue rather than the theoretical limits of the order, as it did in *Wysong* and *Wilson*. In *Womack*, this Court upheld a "safe sex" order given to an HIV-positive airman, holding that protecting the health of Air Force members was a valid military purpose. Responding to a claim that the order was overly broad because it limited sexual contact with civilians having no connection with the military, the Court noted that the appellant was not charged with having contact with civilians and held that the "appellant [was] not entitled to relief based on other, hypothetical conduct." 29 MJ at 91.

In *United States v. Dumford*, 30 MJ 137 (1990), this Court upheld a safe-sex order, even though the appellant's partner was a female civilian. The Court held that "the military has a legitimate interest in limiting [appellant's] contact with others, including civilians." *Id.* at 138.

▮ The Court of Criminal Appeals found that CWO–2 Dilger did not articulate a factual justification for his order. We will not overturn the lower court's findings of fact unless they are clearly erroneous. *United States v. Avery*, 40 MJ 325, 328 (CMA 1994). However, this case does not involve the correctness of the lower court's factfinding. It involves the lower court's holding that the order was unlawful because the commander's justification for the order was inadequate. The ultimate issue whether the order was lawful is a question of law that we review *de novo*. S. Childress & M. Davis, 2 *Federal Standards of Review* § 7.05 (2d ed.1992).

▮ Turning to the first certified question, we hold that the order had a valid military purpose. It was directed at protecting a 14–year–old girl and the reputation of the military. In *Dumford*, this Court recognized that the military has a legitimate interest in

protecting civilians from injury by service-members. That interest is even greater when the civilian is a 14–year–old girl. Both *Milldebrandt* and Article 134 recognize the military's legitimate interest in protecting its reputation with the civilian community.

We hold further that the order, as interpreted by the military judge and as applied to the facts of this case, was not overly broad. As this Court did in *Womack*, we have examined the conduct at issue and not "other, hypothetical conduct." 29 MJ at 91. SA Padgett's conduct with LB, a minor child, clearly was the type of unlawful, service-discrediting conduct that may be prohibited by military orders. Accordingly, we answer the first certified question in the affirmative.

Turning to the second certified issue, we also answer it in the affirmative. We hold that the court below erred when it concluded that the order was invalid because CWO–2 Dilger had not determined that illegal or service-discrediting conduct had occurred or would occur if he did not prohibit SA Padgett from continuing his relationship with LB. There is no requirement in the law that a commander determine whether improper conduct has occurred before prohibiting it and no requirement that a commander determine that a member of the command intends to commit an improper act before prohibiting it. To the contrary, the Manual for Courts–Martial recognizes that an order may have a preventive or protective function, to "safeguard or promote the morale, discipline, and usefulness of members of a command." Para. 14(c)(2)(a)(iii), Part IV. The requirement for a valid military purpose is satisfied if the commander issues such a protective order, directing a servicemember to refrain from certain improper conduct, whether or not that servicemember has or intends to engage in such conduct.

It is well established that a commander may not issue an order to obey the law and then punish the servicemember for both the substantive violation of the law and disobedience of the order. *Id.* ("Disobedience of an order ... which is given for the sole purpose of increasing the penalty for an of-fense which it is expected the accused may commit, is not punishable under this article."); *United States v. Bratcher*, 18 USCMA 125, 128, 39 CMR 125, 128 (1969) ("[A]n order to obey the law can have no validity beyond the limit of the ultimate offense committed.").

This is not such a case. Here the commander did not purport merely to order SA Padgett to obey the law; he ordered him to terminate a relationship that was inappropriate but not necessarily illegal. The commander gave the order because he had a reasonable basis to conclude that the relationship could ripen into criminal behavior.

Furthermore, this is not a case where the same conduct was punished as both a substantive violation of the law and disobedience of an order. The order involved SA Padgett's relationship with LB. The substantive offense, *i.e.*, committing indecent acts with a minor, involved JC, a 13–year–old friend of LB. CWO–2 Dilger's order prohibiting the relationship with LB was violated well before SA Padgett committed the substantive offense with JC.

Finally, we also answer the third certified question in the affirmative, for substantially the same reasons as the second certified question. We disagree with the assertions of appellate defense counsel to the extent that they suggest different standards for orders intended to protect servicemembers from themselves and orders intended to protect others from servicemembers. In our view, either category of protective orders has a valid military purpose. *See Dumford* (order intended to protect civilians from injury by servicemembers); *see also* para. 76 (proscription against incapacitating self for performance of duties) and para. 103a (proscription against self-injury), Part IV, Manual, *supra*.

### Decision

The decision of the United States Coast Guard Court of Criminal Appeals is set aside. The record of trial is returned to the General Counsel of the Department of Transportation for remand to that court for further review

consistent with this opinion. Thereafter, Article 67, UCMJ, 10 USC § 867 (1994), will apply.

Chief Judge COX and Judges SULLIVAN, CRAWFORD, and EFFRON concur.