UNITED STATES

v.

Jeffrey G. TOOHEY, Staff Sergeant
(E–6), U.S. Marine Corps.

NMCCA 20001621.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 13 Aug. 1998.

Decided 30 Sept. 2004.

Maj Anthony Williams, USMC, Appellate Defense Counsel.

Maj Eric P. Gifford, USMC, Appellate Defense Counsel.

Lt Clarice B. Julka, JAGC, USNR, Appellate Government Counsel.

Lt Frank L. Gatto, JAGC, USNR, Appellate Government Counsel.

Cdr R.P. Taishoff, JAGC, USN, Appellate Government Counsel.

Before PRICE, Senior Judge, CARVER, Senior Judge, and HEALEY, Appellate Military Judge.

CARVER, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of rape and assault consummated by a battery, in violation of Articles 120 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 928. The appellant was sentenced to a dishonorable discharge, confinement for 12 years, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged.

The appellant alleges (1) that the evidence is factually and legally insufficient to sustain his conviction on the rape charge; (2) that evidence of the invocation of his right to counsel was unfairly presented to and argued before the members; (3) that the military judge erred in ruling that the appellant's possession of child pornography could be used to rebut evidence of the appellant's peacefulness; (4) that a member employed unlawful command influence during sentencing deliberations; and (5) that he is entitled to relief based upon the doctrine of "cumulative error." *See* Appellant's Brief and Assignments of Error of 28 Mar 2002 (Appellant's Brief).[1] In addition, the appellant, both through counsel and *pro se*, has raised several issues regarding the conditions of pretrial and post-trial confinement and the delays in the post-trial processing of his case. *Id.;* Appellant's Brief of 28 Mar 2002, pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982)(*Grostefon* Brief).

On 13 January 2004, the appellant filed a *pro se* motion for appropriate relief before this court, seeking deferment of his sentence pending appeal due to the lengthy delays. This court denied that motion on 29 January 2004, and the appellant then filed a Petition for Extraordinary Relief with the U.S. Court of Appeals for the Armed Forces (CAAF) on 18 February 2004. On 2 July 2004, the CAAF issued a decision directing this court to render a decision as soon as possible, and to consider whether the delays thus far violated the appellant's Fifth Amendment right to due process, or warranted relief under Article 66(c), UCMJ. *See Toohey v. United States,* 60 M.J. 100 (C.A.A.F.2004).

We have carefully considered the voluminous record of trial, the extensive appellate pleadings, the submissions by the appellant pursuant to *Grostefon,* and the mandate of our superior court. We conclude that the findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## Post–Trial Delay

### A. Introduction

The appellant provided a chronology of events relevant to the post-trial processing of his case, which was adopted by our superior court. *See Toohey,* 60 M.J. at 101. The appellant complains of post-trial delay, both during the convening authority's review and during review before this court.

It is undisputed that the convening authority (CA) did not take action on the appellant's case until 644 days after conclusion of the trial. Additionally, it took another 146 days from the time of the CA's action until this court received the record of trial. The case was docketed at this court on 26 October 2000; all appellate pleadings were filed with the court by 6 February 2003.

An appellant's right to timely review extends to the post-trial and appellate process. *See Diaz v. Judge Advocate General of the Navy,* 59 M.J. 34, 37 (C.A.A.F.2003). This right is embodied in Article 66, UCMJ, as well as the Due Process Clause of the Fifth Amendment. *See Toohey,* 60 M.J. at 101–02; *Diaz,* 59 M.J. at 37–38.

In *Toohey,* our superior court directed us to evaluate the delay in the appellant's case under both statutory and constitutional grounds, and to fashion an appropriate remedy for any violation we might find. *Toohey,* 60 M.J. at 103–04. After carefully reviewing the record, appellate pleadings, and the applicable law, we decline to grant relief on either basis.

### B. Due Process

In *Toohey,* 60 M.J. at 102–03, the CAAF set forth a framework for evaluating claims of prejudicial appellate delay under the Due Process Clause. Following several federal courts, the CAAF applied four factors for due process speedy trial claims: (1) the length of the delay; (2) reasons for the delay; (3) whether the appellant asserted his right to a timely appeal; and (4) prejudice to the appellant. *Id.* at 102 (footnote and citations omitted); *see also Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101

---

1. The appellant's Motion for Oral Argument of 31 March 2003 is denied.

(1972). Applying *Barker* to post-trial delay is consistent with the practice in nearly every federal circuit addressing the issue. *See Mims v. LeBlanc,* 176 F.3d 280, 282 (5th Cir.1999); *United States v. Smith,* 94 F.3d 204, 206–08 (6th Cir.1996); *United States v. Hawkins,* 78 F.3d 348, 350–51 (8th Cir.1996); *Simmons v. Beyer,* 44 F.3d 1160, 1171 (3d Cir.1995); *United States v. Mohawk,* 20 F.3d 1480, 1485 (9th Cir.1994); *Harris v. Champion,* 15 F.3d 1538, 1546 (10th Cir.1994); *United States v. Kimmons,* 917 F.2d 1011, 1015 (7th Cir.1990); *Simmons v. Reynolds,* 898 F.2d 865 (2d Cir.1990); *United States v. Johnson,* 732 F.2d 379, 381–82 (4th Cir.1984). We evaluate each of these factors in turn.

### 1. Length of Delay

Regarding the first *Barker* factor, the CAAF recognized that the length of delay can be a "triggering mechanism" to determine whether a full analysis is warranted. *Toohey,* 60 M.J. at 102. There is no bright-line standard for "[h]ow much delay is too much," but the CAAF concluded that the nearly six-year delay in the appellant's case satisfied the length of delay criterion and thus requires a full due process analysis. *Id.* at 103. Since our superior court has already determined this portion of the analysis, we will not revisit it here.

### 2. Reasons for Delay

The appellant took nearly a year and a half to file his initial brief after the case was docketed with this court, and an additional two months to file his reply brief. The appellant did not file his *pro se* petition for extraordinary relief complaining of appellate delay until well after all of the briefs were filed. Unlike the accused in *Diaz,* the appellant has not objected to the level of assistance provided by his appellate counsel as a basis for the delay in his case. We assume that the appellant at least tacitly agreed to the eleven enlargements of time requested by his appellate defense counsel and granted by this court. *See generally Doggett v. United States,* 505 U.S. 647, 658, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The sheer volume of the appellate pleadings, which obviously took considerable time to prepare, supports this assumption. The brief submitted by appellate defense counsel is 56 pages; the *Grostefon* brief submitted by the appellant is 38 pages. The Motion to Attach Documents added an additional three-inch stack of documents to the record. Accordingly, we find that 580 days of the appellate delay are properly attributable to the appellant.

The reasons for the remaining delay are largely systemic in nature. In *Diaz,* our superior court rejected any suggestion that "continued delay or less diligence in completing appellate review of a criminal conviction should be tolerated under the UCMJ." 59 M.J. at 39. However, "military-unique considerations" affecting the post-trial and appellate stages of the process must be a part of our analysis. *See Toohey,* 60 M.J. at 102–03.

We also note that the CA's post-trial phase is largely separated from this court's Article 66(c), UCMJ, review: separately tracked, separately funded, and separately staffed. This court has no control over the CA review process until after it is completed. Short of a petition for extraordinary relief, this court would not even be aware of a potential due process violation at the CA stage until the CA acts and forwards the record to us. Delays at the CA phase are thus typically subject to an assignment of error on appeal, and addressed within the normal course of appellate review.

Once a case is docketed with this court, however, we are "directly responsible for exercising institutional vigilance" over the case. *Diaz,* 59 M.J. at 40. We control, to some extent, the delays by appellate counsel and overall management of the pending caseload. The court continually monitors its docket, and an appellant may assert his right to speedy review by motion to the court at any time while such a case is pending, as the appellant did in this case with his Motion for Appropriate Relief. Accordingly, we will evaluate the reasons for delay at each of these distinct stages of the proceedings.

#### a. Delay at the Convening Authority

The initial review by the CA under Article 60, UCMJ, 10 U.S.C. § 860, has no counterpart in the civilian sector. Indeed, Congress could have eliminated the CA's action, autho-

rizing the military judge to order the sentence into execution pursuant to a pretrial agreement, including the power to suspend the sentence or any portion of it. But, military courts have long held that the CA is the last "best chance for post-trial clemency." *See United States v. Key*, 57 M.J. 246, 253 (C.A.A.F.2002)(citing *United States v. Wheelus*, 49 M.J. 283, 287 (C.A.A.F.1998)). This phase of the process affords an appellant the opportunity to raise legal errors, to present additional extenuating or mitigating circumstances, or simply to ask for mercy. The CA, after receiving legal advice from the staff judge advocate or legal officer, sits as a quasi-judicial officer in granting or denying the requested relief. In essence, the Article 60, UCMJ, process serves as the first level of appeal, and the CA possesses broad discretion to grant relief. This procedure is clearly intended to benefit an appellant.

By necessity, a complex case like this consisting of hundreds of pages of transcript plus hundreds more pages of exhibits and attachments, will take more time to review. It should not, however, take years. On this record, we have no indication why it took over two years for the CA to take action on the appellant's case, or why it took an additional 146 days after the CA's action to forward the case to this court for review.

b. Delay at Court of Criminal Appeals

This court enjoys fact-finding powers under Article 66(c), UCMJ, which very few appellate courts possess and which require a thorough review of the entire record by a panel of this court. Our power to protect the rights of an accused has been compared to that of the "proverbial 800–pound gorilla." *United States v. Parker*, 36 M.J. 269, 271 (C.M.A.1993). With that power comes the responsibility to perform the "awesome, plenary, de novo" review to which the appellant is entitled by law. *United States v. Cole*, 31 M.J. 270, 272 (C.M.A.1990).

The court does not, however, control the assignment of personnel to the appellate review activity. *See United States v. Diaz*, 59 M.J. 171, app. at 182–83 (C.A.A.F.2003)(letter from the Chief Judge of this court to the Judge Advocate General of the Navy). Given the number of cases this court receives each year and the number of judges, commissioners, and support staff assigned to it, some delays are inevitable.

Furthermore, this court and the counsel who practice before it are military officers on official orders, usually assigned for no more than three years. This "military-unique" aspect of this court unfortunately creates a rate of turnover considerably higher than that of our federal or state counterparts.

In this context, we nonetheless agree with our superior court that the length of delay in this case is far from optimal. This court received the appellant's case on 11 October 2000, nearly four years ago. All necessary pleadings were completed and the case was submitted to this panel on 11 February 2003. The appellate review in this case has taken longer, as a general rule, than review of a court-martial should take. However, we do not find a lack of diligence in this case, either on the part of counsel or this court. Rather, as Chief Judge Crawford stated, the backlog noted in *Diaz* has now shifted to this court. *See Toohey*, 60 M.J. at 105 (Crawford, C.J., dissenting). Unfortunately, this case is part of that backlog. The appellant has not alleged, nor do we find, any indication of deliberate or malicious intent as a reason for the delay in this case. *Cf. Doggett*, 505 U.S. at 656–57, 112 S.Ct. 2686.

3. Assertion of Right

We note that the third *Barker* factor favors the appellant, but only slightly. He first complained of CA delay more than two years after the conclusion of his court-martial. He similarly asserted his right to an expeditious appellate review by this court only months after the case had been docketed and all briefs were filed.

4. Prejudice

■ The fourth *Barker* factor, prejudice to the appellant, focuses on three types of potential prejudice that may result from appellate delay: 1) extended oppressive incarceration pending appeal; 2) the anxiety and concern of the convicted party awaiting the outcome of the appeal; and, 3) impairment of the convicted party's grounds for appeal or

the viability of his defenses in the event of retrial. *See Mims,* 176 F.3d at 282 (citations omitted); *Hawkins,* 78 F.3d at 351.

An appellant cannot show that his incarceration was oppressive if he was rightfully incarcerated. *See Hawkins,* 78 F.3d at 351. Conversely, even if a conviction or sentence was wrongful, the appellant must distinguish himself from any other prisoner victorious on appeal. *See Mohawk,* 20 F.3d at 1486. If it were otherwise, then prejudice would exist in every case of appellate delay where a prisoner is awarded a new trial. *Id.* The appellant also argues that he has been denied a transfer to the federal prison system and thus confined farther from his family due to the delay. We regard this assertion as highly speculative. No prisoner has a legal entitlement to a particular custody classification, location, or parole. Further, this court does not participate in the day-to-day administration of confinement facilities. *See United States v. Jenkins,* 50 M.J. 577, 582 (N.M.Ct. Crim.App.1999).

Even assuming that the appellant has suffered anxiety and concern while his appeal is pending, he has not shown that he reasonably experienced anxiety and concern to such a degree as to distinguish his case from that of any other prisoner awaiting the outcome of an appeal. *See Mohawk,* 20 F.3d at 1486.

Finally, the most important component of possible prejudice is whether the appellant's legal position has been impaired by the delay. *Cf. Simmons,* 44 F.3d at 1171 (holding that defendant was prejudiced by the inability to fully litigate a racial bias issue with the reconstructed record of trial). The appellant asserts this type of prejudice in three respects. First, he claims review of his case by the Naval Clemency and Parole Board (NCPB) was delayed by some 43 months due to the delay in the CA's action. Second, he maintains that he was denied adequate law library facilities while a prisoner at Marine Corps Base Brig, Camp Lejeune, and could not be transferred to Fort Leavenworth until the CA acted. Third, he alleges "general prejudice" in his ability to mount a defense should an appellate court order a rehearing. Appellant's Brief at 51.

We find no prejudice in this case. The appellant's claim regarding NCPB review is purely speculative. Apparently, his case has since been reviewed by NCPB, but the appellant makes no mention of being awarded any relief from that entity. We have no basis to assume that the appellant would have somehow received a more favorable result had his case been reviewed earlier, nor does the appellant make such an assertion. *See United States v. Hudson,* 46 M.J. 226, 227 (C.A.A.F. 1997).

Likewise, we conclude that the appellant has not been prejudiced if he did not have access to an adequate law library. The appellant was able to research, write, and file his own brief pursuant to *Grostefon* contemporaneously with his appellate counsel's submission on his behalf. The appellant's *pro se* brief consists of 38 pages and a three-inch stack of attachments, which he apparently had sufficient time to prepare following the CA's action.

The appellant's general allegation of prejudice to his case on rehearing is unpersuasive. As one circuit court held:

> [The defendant] has not identified any witness he would wish to call on retrial who would be unavailable to testify. His mere speculation on this point carries no weight.... [W]e doubt that a change in a defendant's ability to impeach an unfavorable witness, attributable to the inevitable change over time in the circumstances under which that witness testifies, implicates the rights protected by the Due Process Clause.

*Mohawk,* 20 F.3d at 1486–87. Accordingly, we find no prejudice implicating a violation of due process.

### 5. Conclusion

As a remedy, the appellant asked to be released from confinement. This is an "extraordinary remedy." *Simmons,* 898 F.2d at 869. However, our superior court has already rejected release from confinement as a remedy in this case. *See Toohey,* 60 M.J. at 104. We would not grant such extraordinary relief as a remedy even if we had found a due process violation. Given our resolution of the remaining assigned errors in this case

against the appellant, we do not believe any relief is warranted due to the post-trial and appellate delay.

## C. Article 66(c), UCMJ

■ The appellant also has the right to timely post-trial review of his case under Article 66, UCMJ. *See United States v. Williams*, 55 M.J. 302, 305 (C.A.A.F.2001); *Hudson*, 46 M.J. at 227. Although lengthy post-trial delay "reflects poorly on the administration of military justice," the appellant still must demonstrate some prejudice as a result of the delay. *Williams*, 55 M.J. at 305 (citation omitted); *United States v. Jenkins*, 38 M.J. 287 (C.M.A.1993); *see* Arts. 59(a) and 66(c), UCMJ.

The appellant's assertion of "general prejudice" is nothing more than a claim that the delay itself is prejudice. Our superior court has rejected that approach. *See Williams*, 55 M.J. at 305 (holding no prejudice for delay of 753 days between trial and CA's action).

The record contains no explanation for the significant post-trial delay at the CA review stage of the proceedings. We are particularly troubled by the 146 days that elapsed between the promulgation of the CA's action and receipt of the record at this court. *See United States v. Dunbar*, 31 M.J. 70, 73 (C.M.A.1990)(describing such delay as "the least defensible of all" post-trial delay). However, we also recognize that the appellant's court-martial transcript is 11 volumes, consisting of 943 pages and a large number of attachments. The Article 60, UCMJ, review of this case undoubtedly took a great deal of time.

As for delay after the case was docketed at this court, we note that nearly half of the time between docketing and this court's decision denying the appellant's extraordinary writ is attributable to the appellant. The appellant cannot take 580 days to research and write his own appellate pleadings, then expect the Government or this court to complete their tasks immediately. This is a complex multi-volume case, with a significant number of briefed issues on appeal. We note that the Government took less than half the time to file its brief than the appellant required for his own. This court, subtracting

the time the case was at our superior court on the extraordinary writ, also took less time to complete its review than the appellant required to file his pleadings.

■ We are cognizant of this court's power under Article 66(c), UCMJ, to grant sentence relief even in the absence of actual prejudice. *See United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F.2002). We are also aware that our sister court has taken such an extraordinary step in egregious cases. *See United States v. Collazo*, 53 M.J. 721 (Army Ct.Crim.App.2000). The appellant cites to both cases as an alternate prayer for relief. Appellant's Brief at 51–52. However, relief pursuant to Article 66(c), UCMJ, should only be granted under the most extraordinary of circumstances. *See United States v. Wallace*, 58 M.J. 759, 775 (N.M.Ct.Crim.App. 2003); *see also* Art. 59(a), UCMJ. While we do not condone the length of delay in this case, we conclude that there is nothing so extraordinary about this case that merits the exercise of our Article 66(c) powers.

## Sufficiency of the Evidence

■ The appellant contends that the evidence supporting the rape conviction is factually and legally insufficient. In particular, the appellant claims that there was insufficient evidence of force. We disagree.

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *United States v. Reed*, 51 M.J. 559, 561–62 (N.M.Ct.Crim.App.1999), *aff'd*, 54 M.J. 37 (C.A.A.F.2000); *see also* Art. 66(c), UCMJ. There is no question that the Government presented legally sufficient evidence on the rape charge. There are only two elements to the offense of rape: 1) sexual intercourse, and 2) that the intercourse occurred by force and without consent. *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 45b(1). At a pretrial session of court, the appellant pled guilty to a

charge of adultery, conclusively establishing the first element.[2] Record at 248–64. The alleged victim, JT, testified that the appellant knocked her unconscious with his fist and penetrated her shortly after she regained consciousness, when she was unable to resist. She likewise specifically stated that she did not consent to any act of sexual intercourse with the appellant. This testimony alone provided legally sufficient evidence to establish the second element of the offense.

The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325; *see* Art. 66(c), UCMJ. Reasonable doubt, however, does not mean the evidence must be free from conflict. *See Reed*, 51 M.J. at 562; *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986).

The alleged rape occurred in a van driven by the appellant, after he and JT left a bar together. There are no other eyewitnesses to the rape or the assault. JT testified that she trusted the appellant to give her a ride home because she often dealt with Marines at her job as a waitress, and they were always very polite and respectful. She had no reason to believe that the appellant intended to harm her in any way, based upon their conversation that night. As the appellant drove away from the bar, the two continued to talk and listen to the radio. The appellant then pulled over along a residential street and shut off the van. He moved toward the back of the van and told JT to join him. She said no. He again asked her to join him and she got up between the two front seats. She does not remember being struck, but lost consciousness. When she awoke, she was on her back with her head at the rear of the van. The appellant was standing over her. He pulled down her pants and panties with one hand, then penetrated her. She was still too groggy from the blow to resist him. After a very short while, the appellant seemed to lose interest

and went back to the driver's seat of the van. JT gathered up her belongings and left the vehicle. She recognized the location as the Pentagon parking lot. She walked across the parking lot, still dazed, and found a Defense Protective Service (DPS) squad car and requested assistance. She initially disclosed only the assault. Then, several minutes later, she told the DPS officer that she also had been raped.

The appellant, conversely, testified that the intercourse was consensual, albeit brief and hurried. Afterwards, the appellant informed JT that he was married, a fact that he had deliberately concealed during the evening, prompting JT to slap him. The appellant then responded by striking JT in the head, after which she walked away from his vehicle, and he left her in the parking lot of the Pentagon.

An examination by a Sexual Assault Nurse Examiner revealed a 2–3 centimeter abraided area at the 6 o'clock position on JT's posterior fourchette. The nurse testified for the prosecution that this injury was consistent with a "mounting injury" resulting from forcible intercourse. The defense expert, an experienced Navy doctor, believed that the injuries could also be from consensual intercourse, but conceded that the injuries could also be consistent with rape. JT's pants, which she described as in good condition prior to the assault, showed torn elastic in the waistband, consistent with her account of the appellant violently pulling her pants down. A bloodstain on the back of the appellant's shirt was a DNA match with JT. Photographs of JT show where blood had rolled back along her face, toward her ear, consistent with bleeding while lying on her back.

Ultimately, however, this case hinged on the credibility of JT and the appellant. The appellant, by his own admission, lied or misled both his wife and his officer-in-charge about his actions on that night. His testimony that he struck JT only once defies common sense, given the extent of her facial injuries. Most importantly, a brief consensual sexual encounter is unlikely to have sud-

---

**2.** After the members found the appellant guilty of rape, the military judge dismissed the adultery charge.

denly turned violent as the appellant described it. We also regard the appellant's actions of leaving JT, alone and bleeding, in a deserted parking lot after midnight in the middle of winter, as indicative of a callous disregard for JT's well-being.

While the defense pointed out several inconsistencies in JT's account of the evening, we do not regard any of those inconsistencies as material, nor as undermining her overall credibility. This court is free to disbelieve the appellant's version and believe that of JT. *See United States v. Williams,* 21 M.J. 360 (C.M.A.1986). Likewise, we are free to believe one part of JT's testimony and disbelieve others. *See United States v. Harris,* 8 M.J. 52, 59 (C.M.A.1979). Within this framework, we are convinced beyond a reasonable doubt that the appellant is guilty of rape.

### Invocation of Right to Counsel

The appellant alleges several separate assignments of error regarding his invocation of the right to counsel during a pretrial interrogation. First, he argues that the trial counsel impermissibly implied during the direct examination of the law enforcement agent who interviewed him that he invoked his right to counsel. Second, he argues that he received ineffective assistance of counsel when his trial defense counsel broached the subject during cross-examination of the same witness. Third, he argues that the military judge erred by not declaring a mistrial, and by not providing a curative instruction.

### A. Facts

In its case-in-chief, the Government called DPS Special Agent (S/A) Mapp who interviewed the appellant the day after the assault. During direct examination, the trial counsel asked a series of questions regarding that interview:

Q: Did you have an opportunity to talk to Staff Sergeant Toohey?

A: Yes, I did.

Q: Before you talked with Staff Sergeant Toohey, did you advise him of his rights?

A: Yes.

Q: And did he waive those rights?

A: Yes, he did.

Q: During that interview, did he indicate he had had contact with a woman in that bar?

A: Yes, he did.

Q: Did he indicate that he had left with that woman?

A: Yes, he did.

Q: During the course of the interview that you had with Staff Sergeant Toohey, did he at any time say that she had attacked him?

A: No, he didn't.

Q: Did he at any time say that he had been acting in self-defense in causing the injuries to her face?

A: No, he didn't.

Q: He didn't relay any story of that nature. Is that correct?

A: Not at all.

Record at 480–81. The defense did not object to any of these questions.

On cross-examination, the trial defense counsel asked the following questions:

Q: [W]here you started talking about what happened after you left the bar, he asked to speak with a lawyer at that time. Correct?

A: Excuse me?

Q: He terminated the interview at that time?

A: After he had told us about leaving with a woman.

Q: So he didn't leave anything out of his story because he didn't tell you a story after that. Correct?

A: I guess in your sense [sic].

Q: I'm just trying to establish that it wasn't like he was lying to anybody. He just invoked his constitutional right to remain silent. Correct?

A: Yes, sir.

Record at 481–82.

The military judge subsequently called an Article 39(a), UCMJ, 10 U.S.C. § 839, session to discuss the issue. He expressed considerable surprise that the trial defense counsel had opened that line of questioning, but refused to allow the Government to ex-

plore the issue further on redirect. He then asked the defense how they wished to proceed. After taking a brief recess for the defense team to confer, the civilian defense counsel (who did not ask the offending questions) addressed the court:

> CC: Yes, sir. First of all, the area that we're in, as Your Honor has pointed out, is a real dangerous quagmire to be in. The defense's position at this point is that it should be absolutely left alone.... The defense requests, Your Honor, that we just leave it alone at this point because the government would not be able to open the door on the matter. My co-counsel chose to counter what the government had done by touching on the rights waiver in an innocuous way. This makes it not innocuous; and to emphasize this further, we believe would not be right and object to it.

Record at 491–92. The military judge then allowed only questions pertaining to the length of the interview. Later in the trial, the trial counsel cross-examined the appellant along similar lines. There was no objection to those questions. *Id.* at 680–81, 701.

## B. Trial Counsel's Examination

The appellant contends that the trial counsel's questions regarding what he did not tell DPS impermissibly commented on his right to remain silent. Because the appellant did not object to the trial counsel's questions at trial, however, this issue is forfeited absent plain error. MIL. R. EVID. 103(a)(1) requires that a timely objection to the admission of evidence include "the specific ground of objection, if the specific ground was not apparent from the context." By failing to raise any objection at trial so the military judge could rule on it, the appellant did not preserve this issue for appellate review. Therefore, we must test it for "plain error." *United States v. Cardreon,* 52 M.J. 213, 216 (C.A.A.F.1999); *United States v. Ibarra,* 53 M.J. 616, 618 (N.M.Ct.Crim.App.2000); MIL R. EVID. 103(d).

To prevail under a plain error analysis, the appellant must persuade this court that: (1)

there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right. *See United States v. Finster,* 51 M.J. 185, 187 (C.A.A.F.1999); *United States v. Powell,* 49 M.J. 460, 463–65 (C.A.A.F.1998). Assuming *arguendo* that there was error in the questioning of S/A Mapp, we conclude that this questioning was not an obvious error. Nor do we believe that this error materially prejudiced any substantial right of the appellant. *See* Art. 59(a), UCMJ.

The United States Supreme Court has held that offering evidence designed to contrast an appellant's pretrial silence with his trial testimony is improper. *See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *see also United States v. Gilley,* 56 M.J. 113, 120 (C.A.A.F.2001)(quoting MIL. R. EVID. 301(f)(3)). The purpose of the evidence is significant. Eliciting evidence of pretrial silence as evidence of consciousness of guilt is impermissible. *See United States v. Alameda,* 57 M.J. 190, 199 (C.A.A.F.2002). However, highlighting that the accused is able to tailor his testimony at trial after hearing all of the other witnesses and evidence is permissible. *See Portuondo v. Agard,* 529 U.S. 61, 69, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000); *United States v. Kirt,* 52 M.J. 699, 704 (N.M.Ct.Crim.App.2000), *aff'd,* 54 M.J. 356 (C.A.A.F.2000).

Application of *Doyle* in situations where an accused answers only certain questions, or provides limited details, is a complex exercise with competing legal authorities. *See* Note, *Protecting* Doyle *Rights After* Anderson v. Charles [3]: *The Problem of Partial Silence,* 69 VA. L.REV. 155 (1983). Moreover, we believe that this questioning would have been entirely appropriate on rebuttal after the appellant had testified, to impeach the appellant's credibility. *See Agard,* 529 U.S. at 69, 120 S.Ct. 1119. Thus, we hold that any error in the questioning of S/A Mapp was neither plain nor obvious.

If there was error, we do not believe that the error was materially prejudicial to the

---

**3.** *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

substantial rights of the appellant. Most of this questioning involved the appellant's claim of self-defense to the assault charge. The evidence of guilt to that charge was so overwhelming that the trial defense counsel essentially conceded it during his own closing argument. We are confident that this brief line of questioning during S/A Mapp's testimony did not have a significant impact on the ultimate findings of the members.[4]

## C. Defense Counsel's Cross–Examination

 The appellant also claims that he was denied the effective assistance of counsel, due to his counsel's cross-examination of S/A Mapp. Even assuming his counsel was deficient in his advocacy, we find no material prejudice to the appellant's substantial rights. *See* Art. 59(a), UCMJ.

The U.S. Supreme Court has articulated two prongs that an appellate court must find before concluding that relief is required for ineffective assistance of counsel—deficient performance and prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The proper standard for attorney performance is that of "reasonably effective" assistance. *Id.* Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. This Constitutional standard applies equally to military cases. *See United States v. Scott,* 24 M.J. 186, 187 (C.M.A.1987). In order to show ineffective assistance, an appellant must "surmount a very high hurdle." *See United States v. Moulton,* 47 M.J. 227, 229 (C.A.A.F.1997). In *Strickland,* the Supreme Court said that:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

particular act or omission of counsel was unreasonable.

466 U.S. at 689, 104 S.Ct. 2052. When viewing tactical decisions by counsel, the test is whether such tactics were unreasonable under prevailing professional norms. *See United States v. Cronic,* 466 U.S. 648, 666, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Such decisions can include whether to waive a Fifth Amendment right. *See United States v. Thompson,* 51 M.J. 431, 436 (C.A.A.F.1999)(holding no ineffective assistance where counsel advised accused not to speak to unprivileged medical personnel). *But see United States v. Paaluhi,* 54 M.J. 181, 184–85 (C.A.A.F.2000)(holding counsel provided ineffective assistance in advising client to speak to psychotherapist and confess to offenses).

In this case, there is no question that counsel made a tactical decision to question S/A Mapp about the appellant's invocation of his rights. This inquiry was in direct response to the trial counsel's earlier questioning and was designed to show that the appellant had not given any false information during the interrogation, but merely terminated the interview without providing greater detail. Record at 489–90. Assuming, without deciding, that counsel's decision was unreasonable, we conclude that it was not prejudicial and thus not ineffective assistance of counsel. *See United States v. Quick,* 59 M.J. 383, 386 (C.A.A.F.2004); *United States v. Adams,* 59 M.J. 367, 371 (C.A.A.F.2004)(holding that a court need not reach the question of deficient representation if it can first determine a lack of prejudice).

The military judge appropriately stopped the Government from exploiting the trial defense counsel's tactic, and gave the defense the opportunity to elect how best to minimize any resulting damage. The civilian defense counsel even referred to the subject as "innocuous," and specifically declined any curative instruction. Record at 492. In order to constitute prejudicial error, counsel's defi-

---

4. We also find no error regarding the similar questions posed to the appellant himself. We conclude that the trial counsel's questions were intended to show that the appellant had tailored

the details of his testimony around the evidence already offered at trial. *See Agard,* 529 U.S. at 69, 120 S.Ct. 1119.

cient performance must render the result of the proceeding "unreliable" or "fundamentally unfair." *See United States v. Ingham*, 42 M.J. 218, 223 (C.A.A.F.1995)(quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)). We do not believe counsel's actions in this case rise to that level.

## D. Instructions and Mistrial

The appellant also asserts that the military judge erred in not declaring a mistrial following his trial defense counsel's questioning of S/A Mapp. Alternatively, the appellant maintains that an appropriate curative instruction should have been given. Appellant's Brief at 32–37. We disagree. The appellant specifically declined such an instruction at trial and requested that the military judge "leave it alone." The appellant cannot create error and then take advantage of a situation of his own making. *See United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996).

Additionally, this court recently recognized the peril of giving an instruction regarding an accused's silence over defense objection. *See United States v. Forbes*, 59 M.J. 934, 942 (N.M.Ct.Crim.App.2004), *rev. granted*, —— M.J. —— (C.A.A.F. Jul. 12, 2004). Although *Forbes* addressed the specific instruction on an accused's failure to testify, we believe much of the same analysis would apply to a situation regarding an accused's invocation of his right to remain silent prior to trial. In a situation such as this, tactical considerations are paramount. *See Forbes*, 59 M.J. at 938; MIL. R. EVID. 301(g), Analysis. To the extent the appellant argues on appeal that his trial defense team somehow had a conflict of interest regarding this issue, we categorically reject such a notion. The trial defense counsel's decision not to request a curative instruction was a reasonable tactical decision. We find no basis in law to presume that counsel are precluded from attempting to repair their errors at trial, nor has the appellant cited any in his brief.

▮▮▮▮▮ Likewise, we do not believe that any error was sufficiently significant to warrant a mistrial. A mistrial is a drastic, unusual, and disfavored remedy. *See United*

*States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F.2004)(citing *United States v. Dancy*, 38 M.J. 1, 6 (C.M.A.1993)). A mistrial should be granted only to prevent manifest injustice to an accused. *Id.* A military judge has "considerable latitude in determining when to grant a mistrial." *Id.* (quoting *United States v. Seward*, 49 M.J. 369, 371 (C.A.A.F.1998)). We will not reverse the military judge's decision absent clear evidence of abuse of discretion. *Id.* (citations omitted). Given the fairly brief exchange on this subject, the trial defense counsel's characterization of it as "innocuous," and the lack of a defense motion for a mistrial, we find no abuse of discretion.

## Evidence of Peacefulness

The military judge ruled that if the appellant offered testimony of his character for peacefulness, the trial counsel would be allowed to cross-examine those witnesses about the appellant's possession of child pornography. We agree with the appellant that this ruling was erroneous, but conclude that the error was not materially prejudicial to a substantial right of the appellant. Art. 59(a), UCMJ.

At a pretrial session of court, the military judge granted a defense motion to sever some of the pending charges, including one specification of possessing child pornography in violation of 18 U.S.C. § 2252. The military judge then explained situations when evidence of the severed charges could be used in the current trial:

> Additionally, I indicated as to the character for peaceableness [sic], if that character is inquired into or evidence is put on by the defense for that character, that would open the door arguably for impeachment regarding the child pornography. Specifically, there are a series of photographs that are in the Article 32 that obviously would be attached to the record ... They are color photographs, and they depict rather graphically sodomy with young children from age 10 purportedly up through 16 or so.
>
> There are some that are more egregious than others. Specifically Investigative Ex-

hibit 19, photograph J, which depicts a purported 14 year-old being anally sodomized and that conduct depicted in those pictures is non consensual as a matter of law conduct; and, therefore, if the defense was to put on a character for peaceableness [sic], that would open the door for impeachment in that area.

Record at 88. The defense objected to this ruling, both under MIL. R. EVID. 404(b) and as improper impeachment, presumably under MIL. R. EVID. 405(a). *Id.* at 92–94. The defense then made an offer of proof that the appellant, but for this ruling, would have called six or seven witnesses, military and civilian, to testify to the appellant's character for peacefulness. Record at 95.

█ In all cases in which evidence of character or a character trait of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct. *See United States v. Catrett,* 55 M.J. 400, 406 (C.A.A.F.2001); MIL. R. EVID. 405(a). Any such impeachment evidence must be relevant under MIL. R. EVID. 401 and 402, and its probative value cannot be substantially outweighed by its prejudicial effect. *See United States v. Barnes,* 57 M.J. 626, 634 (N.M.Ct.Crim.App.2002)(citing *United States v. Pearce,* 27 M.J. 121, 123 (C.M.A.1988)); MIL. R. EVID. 403. When a military judge rules on an evidentiary objection such as this one, we are to apply an abuse of discretion standard. *Id.* (citations omitted).

Whether possession of child pornography is relevant to rebut evidence of peacefulness is apparently a novel question. Counsel has not cited any authority directly on point, nor have we been able to find any case law, state or federal, addressing this subject directly.

Much of the military case law on the subject of child pornography arises within the context of MIL. R. EVID. 404(b). Those cases are instructive to the extent of describing the logical relevance of such materials and limitations on their use. In *United States v. Whitner,* 51 M.J. 457 (C.A.A.F.1999), the accused was charged with several crimes involving homosexual conduct toward a fellow servicemember in their barracks. The Government

sought to introduce a variety of pornographic magazines, catalogues, and videos seized from the accused's room, several of which depicted homosexual acts with military themes and imagery. Our superior court held that "an accused's possession of pornographic books, magazines, or videos concerning a particular sex partner or sexual act, at or near the scene of an alleged sex crime, around the time of that alleged offense may be relevant evidence of his intent or state of mind at that time, depending upon the circumstances of a particular case." *Id.* at 460 (citations omitted).

Similarly, in *United States v. Orsburn,* 31 M.J. 182 (C.M.A.1990), the accused was charged with raping and sodomizing his eight-year-old daughter. The Government introduced three paperback books seized from the accused's bedroom closet, each of which described sexual acts with young girls. The challenged books were again found near the place of the alleged offenses, around the time of the offenses, and in an area under at least partial control of the accused. The court held that these circumstances were a sufficient basis for the judge to find that the challenged evidence tended to show the appellant had the "requisite sexual desires" for conviction of lesser included offenses with a specific intent element. *Id.* at 187; *see also United States v. Mann,* 26 M.J. 1 (C.M.A. 1988); *United States v. Proctor,* 34 M.J. 549, 556–57 (A.F.C.M.R.1992).

█ Possession of child pornography clearly is unlawful and enjoys no First Amendment protection. *See* 18 U.S.C. § 2252; *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). However, courts walk a dangerously fine line when allowing literature or photographs depicting a particular act to create an inference that the possessor has a propensity to commit such acts. *Cf. United States v. Holt,* 170 F.3d 698 (7th Cir.1999)(holding it was error to permit questions regarding the defendant's books on weapon modification as rebuttal of character for law abidingness); *Guam v. Shymanovitz,* 157 F.3d 1154, 1158 (9th Cir.1998)(stating that "the mere possession of reading material that describes a particular type of activity makes it neither

more nor less likely that a defendant would intentionally engage in the conduct described and thus fails to meet the test of relevancy under Rule 401."). Likewise, evidence of generalized sexual deviancy or dispositions, rather than those specifically related to the charged offense, is disfavored. *Cf. Whitner,* 51 M.J. at 462 (Effron, J., concurring in part and in the result); *United States v. Gagan,* 43 M.J. 200 (C.A.A.F.1995). In this case, we conclude that the military judge abused his discretion.

■ First, the pornographic images were not closely related in time, space, or nature to the charged offenses. The images were seized from the appellant's home computer in North Carolina, while the alleged rape and assault occurred in the Washington, D.C. area. The photographs depict teenage or preteen girls, while JT, the alleged victim in this case, was 31 years of age. The photo prompting a specific comment from the military judge depicted anal sodomy, while the appellant was never accused of that offense. The military judge drew a nexus between photographs depicting minors engaging in sexual activity to a lack of consent, which is an element of rape. Factually, however, the circumstances surrounding the alleged rape are noticeably dissimilar from the imagery in the pornographic photos. While the latter are extraordinarily distasteful, they do not appear to depict physical force or violence against the young girls. This is a significant qualitative difference between the acts depicted in the photographs and those of which the appellant was accused. We conclude that the appellant's possession of images depicting sexual acts with young girls does not make it more likely that he would commit a violent, physical assault upon an adult woman. *Cf. United States v. Nixon,* 15 M.J. 1028, 1032 (A.C.M.R.1983)(holding that a conviction for unauthorized absence does not rebut evidence of peacefulness).

Second, even if marginally relevant, we find that the evidence was far more prejudicial than probative. The courts have long recognized the potentially incendiary nature of using sexual deviancy as impeachment. *See United States v. Duty,* 16 M.J. 855, 857 (N.M.C.M.R.1983)(holding that the military judge properly excluded evidence that a witness was promiscuous and had posed for nude photographs). The military judge did not explicitly conduct a balancing test under MIL. R. EVID. 403; consequently, we afford no deference to that aspect of his evidentiary ruling. *See United States v. Manns,* 54 M.J. 164, 166 (C.A.A.F.2000). The prejudicial impact of the pornographic images themselves is undisputed; in fact, it was the primary basis for his ruling to grant severance of those charges. Record at 89–90. The military judge thus erred in tying the appellant's proffered evidence of peacefulness to his possession of child pornography.

■ On the specific facts of this case, however, we find no prejudice. Evidence of peacefulness is primarily relevant to a claim of self-defense. We are firmly convinced that no reasonable jury would have believed the appellant's claim of self-defense, regardless of how many witnesses testified to his character for peacefulness. The appellant is six-foot-two, weighing more than 200 pounds; JT was five-foot-two, and weighed barely half that. Moreover, the photographs of JT's face following the assault show that the appellant was quite capable of being less than peaceful. Finally, the defense effectively conceded the appellant's guilt to the charge of assault consummated by a battery during closing argument.

To the extent that character for peacefulness would have been offered in defense to the rape charge, we believe that the error was mitigated by the testimony of LW, the appellant's ex-wife. Although the trial defense counsel carefully limited his inquiry of LW to the appellant's character for truthfulness, a member specifically asked whether the appellant had ever become violent during their marriage. Record at 793. Neither side objected to this question or to LW's answer that the appellant had never been violent with her, even during heated arguments. Notwithstanding the military judge's earlier ruling, the trial counsel did not inquire about the pornographic images to impeach LW's testimony.

Although the trial defense counsel did not indicate in his offer of proof which witnesses would have testified as to the appellant's

character for peacefulness, it seems highly probable that LW would have been primary among them. Her testimony on that point was probably the most compelling of any potential witness, as she would have been in the best position to observe that character trait, particularly in the context of sexual relations. In fact, she was the only one of the appellant's six character witnesses to whom the members posed such a question. Given that this testimony was placed before the members without the consequences envisioned by the military judge's ruling, or even any mention of the pornographic photos, we find no prejudice.

### Unlawful Command Influence

The appellant alleges that his trial was tainted by unlawful command influence. We find no merit in that argument and decline to grant relief.

In an affidavit prepared more than a year after the appellant's trial, the trial defense counsel described a conversation he had with one of the court members. Specifically, Major P approached the trial defense counsel on base several months after the trial. Major P told the trial defense counsel that the members had originally voted for a lighter sentence, but that he had stated, "if you don't reconsider this, I am leaving." *See* Affidavit of J.N. Jungreis, 28 Oct 1999. The record of trial reflects that the members did request instructions on how to reconsider a sentence. Record at 936. The trial defense counsel then included this affidavit (and a corresponding argument) in his clemency matters submitted to the convening authority. *See* RULE FOR COURT-MARTIAL 1105, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.).

■■■■ The defense has the initial burden of producing sufficient evidence to raise unlawful command influence. *See United States v. Ayala*, 43 M.J. 296, 299 (C.A.A.F. 1995) (citation omitted). On appeal, an appellant must "(1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness." *United States v. Dugan*, 58 M.J. 253, 258 (C.A.A.F.2003)(quoting *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F.1999)). We

hold that the affidavit of the trial defense counsel does not meet this showing.

■■■■ The fact that Major P threatened to leave the deliberation room does not in any way raise the specter of unlawful command influence. First, it was an empty threat. Major P was detailed to the court-martial by the convening authority and we are quite skeptical that he would have left his appointed place of duty without authority. Second, Major P did not sign, write or provide input on any other member's fitness reports, nor was he the senior officer on the panel. Record at 284–85. Third, and most important, there is no indication that Major P attempted to use his grade, or invoke the grade of some higher authority, to influence the other members. *Cf. Dugan*, 58 M.J. at 259; *Ayala*, 43 M.J. at 300. Taken at face value, Major P's comments merely show that the sentencing deliberations became somewhat heated. This is insufficient to raise the issue of unlawful command influence.

### Cumulative Error

■■■■ An appellate court can order a rehearing based on the accumulation of errors not reversible individually. *See United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996). In doing so, the court must review all errors preserved for appeal and all plain errors. *Id.* (citations omitted). We do not believe any of the appellant's asserted errors, alone or in combination, rendered the proceedings unfair or altered the eventual outcome. We thus decline to order a rehearing on the basis of cumulative error.

### Conditions of Pretrial Confinement

It is undisputed that the appellant spent 199 days in "special quarters" at the Camp Lejeune Base Brig. The stated basis for this classification was "the serious nature of [the appellant's] charges." *See* Appellant's Motion to Attach Documents of 28 Mar 2002. Based on the foregoing, the appellant contends that he was subjected to illegal pretrial punishment due to the conditions of his pretrial confinement. Appellant's Brief at 43–48. We disagree.

■ Whether a pretrial detainee suffered unlawful punishment is a mixed question of law and fact that qualifies for independent review. *See United States v. Pryor,* 57 M.J. 821, 825 (N.M.Ct.Crim.App.2003), *rev. denied* 59 M.J. 32 (C.A.A.F.2003). The burden of proof is on the appellant to show a violation of Article 13, UCMJ, 10 U.S.C. § 813. *See United States v. Mosby,* 56 M.J. 309, 310 (C.A.A.F.2002). Article 13 prohibits two things: (1) the intentional imposition of punishment on an accused before his or her guilt is established at trial, i.e., illegal pretrial punishment, and (2) arrest or pretrial confinement conditions that are more rigorous than necessary to ensure the accused's presence at trial, i.e., illegal pretrial confinement. *See United States v. Inong,* 58 M.J. 460, 463 (C.A.A.F.2003) (citations omitted).

■ The "punishment prong" of Article 13, UCMJ, focuses on intent, while the "rigorous circumstances" prong focuses on the conditions of pretrial restraint. *See Pryor,* 57 M.J. at 825 (citing *United States v. McCarthy,* 47 M.J. 162, 165 (C.A.A.F.1997)). Conditions are not deemed "unduly rigorous" if, under the totality of the circumstances, they are reasonably imposed pursuant to legitimate governmental interests. *See McCarthy,* 47 M.J. at 168; *United States v. Singleton,* 59 M.J. 618, 621 (Army Ct.Crim. App.2003). When an arbitrary brig policy results in particularly egregious conditions of confinement, the court may infer that an accused has been subjected to pretrial punishment. *See United States v. Mazer,* 58 M.J. 691, 702 (N.M.Ct.Crim.App.2003). However, if the conditions of pretrial restraint were reasonably related to a legitimate government objective, an appellant will not be entitled to relief. *See McCarthy,* 47 M.J. at 167; *see also United States v. Sittingbear,* 54 M.J. 737, 741 (N.M.Ct.Crim.App. 2001).

The policies and procedures of the Camp Lejeune Base Brig have undergone considerable scrutiny by this court in recent years. *See, e.g., United States v. Kinzer,* 56 M.J. 741, 742 (N.M.Ct.Crim.App.2002); *Mosby,* 56 M.J. at 310. In *Kinzer,* this court granted relief due to the "arbitrary policy" of keeping all prisoners facing greater than seven years of confinement in special quarters. 56 M.J.

at 741. However, in *Kinzer* this issue was litigated thoroughly at trial. *Id.* at 740 n. 1. The appellant's failure to litigate this issue until now is "strong evidence" that Article 13, UCMJ, was not violated. *See United States v. Garcia,* 57 M.J. 716, 731 (N.M.Ct.Crim.App.2002)(quoting *United States v. Huffman,* 40 M.J. 225, 227 (C.M.A. 1994)), *rev'd on other grounds,* 59 M.J. 447 (C.A.A.F.2004).

■ Moreover, the accused in *Kinzer* was awaiting trial on drug charges. The appellant here was accused of a violent assault. *Cf. Mosby,* 56 M.J. at 310. The nature and seriousness of the offenses and the corresponding potential length of confinement are relevant factors that brig officials may consider in determining whether to place a detainee in special quarters. *See Garcia,* 57 M.J. at 731; *United States v. Anderson,* 49 M.J. 575, 577 (N.M.Ct.Crim. App.1998). The placement of a detainee in solitary confinement simply because of the seriousness of his offense does not violate Article 13, UCMJ, in the absence of any evidence showing the intent to punish. *See Mosby,* 56 M.J. at 310–11. The appellant has not demonstrated the intent to punish and we find that the violent and serious nature of the charges against him justified the decision to keep him in special quarters pending trial. We decline to grant relief.

### Post–Trial Confinement Conditions

The appellant, in his *Grostefon* brief, complains of several conditions of his post-trial confinement at Camp Lejeune. First, he claims to have been denied meaningful access to the courts due to the lack of library facilities. This court has already denied a similar claim, with essentially identical facts, regarding the Camp Lejeune Brig. *See United States v. Wallace,* 58 M.J. 759, 769 (N.M.Ct. Crim.App.2003); *see also Singleton,* 59 M.J. 618 (Army Ct.Crim.App.2003); *United States v. Carter,* 56 M.J. 649, 650 (A.F.Ct.Crim.App. 2001), *rev. denied,* 56 M.J. 467 (C.A.A.F. 2002). We see nothing to distinguish the appellant's case from *Wallace,* and thus decline to grant relief on that basis.

Second, he claims that his First Amendment rights to freedom of expression, freedom of religion, and freedom of assembly were violated by the brig's policies and en-

forcement. "[M]ilitary authorities may curtail a servicemember's communication and association with other individuals—and thus burden the servicemember's freedom of speech and association—provided the authorities act with a valid military purpose and issue a clear, specific, narrowly drawn mandate." *United States v. Moore*, 58 M.J. 466, 468 (C.A.A.F.2003)(citing *United States v. Jeffers*, 57 M.J. 13, 15–16 (C.A.A.F.2002); *United States v. Padgett*, 48 M.J. 273, 276–78 (C.A.A.F.1998); *United States v. Nieves*, 44 M.J. 96, 98–99 (C.A.A.F.1996); *United States v. Womack*, 29 M.J. 88, 90 (C.M.A.1989)). This consideration holds particularly true in the confinement context. Discipline in military facilities is undoubtedly more rigid than in many civilian prisons, but we do not believe that fact alone amounts to a constitutional violation. The appellant objects to two rules, one prohibiting harassment of the staff and the other prohibiting prisoners combining to influence higher authority. We believe the reasoning behind both of these rules is self-evident, and clearly related to a valid military purpose.

Third, the appellant claims that the conditions of his confinement amount to cruel and unusual punishment, in violation of the Eighth Amendment and Article 55, UCMJ, 10 U.S.C. § 855. We disagree. Again, the conditions of a military confinement facility are without question austere, but we do not believe any of the conditions rise to the level of cruel or unusual punishment. *See generally United States v. Avila*, 53 M.J. 99 (C.A.A.F.2000)(surveying civilian cases on the issue and holding that solitary confinement did not constitute cruel and unusual punishment). On the record before us, we find no violation either of the Eighth Amendment or Article 55, UCMJ.

### Conclusion

Accordingly, the findings of guilty and sentence, as approved by the convening authority below, are affirmed.

Senior Judge PRICE and Judge HEALEY concur.