# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM S32554**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Eric R. PROCTOR**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 4 June 2020

————————————

*Military Judge:* Christina M. Jimenez.

*Approved sentence:* Bad-conduct discharge and reduction to E-3. Sentence adjudged 24 August 2018 by SpCM convened at Schriever Air Force Base, Colorado.

*For Appellant:* Major David A. Schiavone, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Judge:

A special court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of six specifications of willfully disobeying a lawful command from his squadron commander, one specification of assault

consummated by a battery, and one specification of wrongfully communicating a threat, in violation of Articles 90, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 890, 928, 934.[1] Appellant was sentenced to a bad-conduct discharge, hard labor without confinement for three months, and reduction to the grade of E-3. The convening authority approved the bad-conduct discharge and the reduction in grade, and disapproved the hard labor without confinement.

Appellant raises four issues on appeal: (1) whether the military judge erred when she found six no-contact orders to be lawful; (2) whether the military judge erred in denying Appellant's request for an instruction on self-defense to the assault consummated by a battery offense; (3) whether the military judge's failure to *sua sponte* instruct on defense of property as a defense to the assault consummated by a battery offense was plain error; and (4) whether there was evidence of unlawful command influence (UCI) when Appellant's commander held a commander's call to address his squadron's noncommissioned officer (NCO) "problem" just over one year before Appellant's court-martial.

We find no prejudicial error and affirm.

## I. BACKGROUND

Appellant's convictions are the result of his conduct with Airmen who were assigned with Appellant to the security forces squadron at Schriever Air Force Base, Colorado, to include interactions he had with his girlfriend, Staff Sergeant (SSgt) CM.

Appellant, his three children, and SSgt CM shared an off-base apartment in Colorado Springs, Colorado. On Thanksgiving Day in 2016, SSgt CM invited SSgt AG and junior Airmen assigned to her flight to celebrate the holiday in her home. Appellant returned to the apartment after his shift and drove out the Airmen, angry that guests were in his home. While doing so, Appellant strangled SSgt AG by grabbing his throat with Appellant's hand after SSgt AG came to the defense of an Airman whose presence Appellant found especially provoking. In a second incident, in December 2016, after SSgt CM and Appellant separately returned home from a squadron Christmas party, SSgt CM came towards Appellant with a knife and Appellant responded by drawing a gun before the incident deescalated.

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States (MCM)* (2016 ed.).

Appellant's commander, Lieutenant Colonel (Lt Col) MS, was unaware of Appellant's conduct on Thanksgiving and after his squadron's Christmas party when he issued Appellant an order to refrain from having any contact or communication with SSgt CM.[2] That first no-contact order was given in February 2017 after Lt Col MS received a report from his NCOs that Appellant had strangled SSgt CM in their apartment and threatened to kill her. In time, Lt Col MS issued an additional six commands in succession, continuing his order that Appellant refrain from communicating and having contact with SSgt CM when a preceding order was about to expire. Appellant willfully disobeyed each of the six orders, including during the time that Lt Col MS had ordered Appellant into pretrial confinement, and after Appellant's release from pretrial confinement over a year before trial.

## II. DISCUSSION

### A. Legality of the No-Contact Orders

The Government charged Appellant with disobeying the six orders, and grouped the violations under six specifications, one for each order it alleged Appellant disobeyed. At trial, Appellant challenged the six orders claiming they did not serve a valid military purpose and were thus unlawful. The military judge found the orders were lawful and issued a written ruling denying Appellant's motion to dismiss the six specifications.[3] Appellant renews his challenge in this appeal.

#### 1. Additional Background

In February 2017, SSgt CM contacted her supervisor because she and Appellant were in a physical altercation and she needed help. Her supervisor and first sergeant, both senior NCOs, responded to the shared residence and observed Appellant was emotionally distraught. SSgt CM reported Appellant had strangled her and she had scratched Appellant's face trying to get away. She further stated Appellant had threatened to kill her. Civilian law enforcement personnel were called to respond to the incident, but neither Appellant nor SSgt CM were willing to cooperate with the police. On 21 February 2017, their squadron commander, Lt Col MS, issued no-contact orders to both Appellant

---

[2] Lt Col MS issued a reciprocal order and subsequent orders to SSgt CM to refrain from all communication and contact with Appellant.

[3] Appellant was convicted of violating six orders issued on 22 March 2017, 19 May 2017, 19 June 2017, 1 August 2017, 31 August 2017, and 22 September 2017.

and SSgt CM. Appellant's order expired on 7 March 2017[4] and was not contested at trial or on appeal.

After the order expired, on 18 March 2017 local police responded to Appellant's residence in response to an allegation that Appellant had choked or beaten SSgt CM's nine-week-old puppy after she left for work. Lt Col MS was briefed on the incident by the NCOs and then spoke with SSgt CM. She related the February incident was "not the first time [Appellant] put his hands on [her]" and she "can't count how many times that [Appellant] choked [her] out until [her] eyes were blood red." Lt Col MS recalled seeing SSgt CM on duty and observing her eyes were unusually red, which at the time she attributed to a sneeze.[5]

On 22 March 2017, Lt Col MS issued a second order to Appellant commanding him to have no communication or contact with SSgt CM for two months. He based his decision to issue this and subsequent orders on his years of listening to victims of domestic violence, concluding that SSgt CM was caught in a cycle of violence and Appellant would "harm things that are precious to [her]" such as her puppy. Lt Col MS saw a pattern whereby neither NCO was willing to cooperate with civilian police, and the harm done to SSgt CM's puppy showed an "escalation of the domestic violence" in their relationship "and it's just going to get worse." Lt Col MS explained he issued the order for SSgt CM's protection and for good order and discipline, noting he was aware of "two violent interactions that are happening in [his] unit by two people that are supposed to be NCOs leading [his] [A]irmen."

Before the second no-contact order was set to expire on 22 May 2017, Lt Col MS learned Appellant posted a message on Facebook, sometime between 10 and 21 May 2017, that read:

> What ether should I drop first? Shots Fired or Officer Down?
> Once them shi[*]s drop then I'll go ahead and drop that joint I
> got . . . . Had to kick Lee Lee out for flaugin and workin for 12.

Appellant's friend, SSgt JP, who was also a member of the squadron, saw Appellant's Facebook post and responded, "some mofos only got a few hours left" followed by an image of three skulls. After SSgt JP's post, Appellant responded indicating he "liked" SSgt JP's post via Facebook.

---

[4] Lt Col MS testified he allowed the order to expire because "there was no police action being taken downtown" or "other incidents of violence," and he learned from NCOs in the squadron that Appellant and SSgt CM "were working through their situation."

[5] Lt Col MS acknowledged in his testimony that after he met with SSgt CM in regard to the puppy incident he had "seen her come to work with burst capillaries in her eyes."

Lt Col MS did not initially understand Appellant's Facebook post, but found it unusual that a security forces NCO would post "Shots Fired," and "Officer Down." He soon learned "Lee Lee" was the nickname for Mr. LA, a former Airman and one-time friend of Appellant who was married to an NCO in his squadron. Lt Col MS was aware that Mr. LA, his wife, and several members of the squadron had written statements that were used as evidence in nonjudicial punishment proceedings alleging that Appellant had violated the second no-contact order.[6] Lt Col MS learned "flaugin" was slang for lying or snitching, and "workin for the 12" meant working for the police. Mr. LA's wife understood "Shots Fired" and "Officer Down" as "referring to [her] husband" who was a civilian member of law enforcement. Mr. LA considered the posts to be a threat directed at him and was concerned to the point that he retrieved and loaded his gun and then stayed up late in the event that Appellant or someone on Appellant's behalf might act on the threat.

Lt Col MS understood the Facebook post as an escalation of threats towards members of his squadron for cooperating and making statements against Appellant. On 19 May 2017, Lt Col MS continued the no-contact order and expanded its scope to include additional personnel.[7] Lt Col MS was concerned Appellant "would reach out to intimidate, threat[en] or harass either [SSgt CM] or any of these people if [Lt Col MS] didn't have a no-contact order in place." Around the same time he issued the expanded order, he learned of other allegations of violent acts that Appellant had committed against SSgt CM and threats Appellant made against others. This included the allegation of violence on Thanksgiving and that SSgt CM pulled a knife on Appellant and Appellant in turn pulled a gun on her after the squadron's Christmas party. Lt Col MS had also heard that Appellant had made threats to "go after" members of the squadron who had made statements against Appellant.

Lt Col MS continued the series of no-contact orders until Appellant's legal proceedings concluded.[8] Lt Col MS testified he issued the orders because of the ongoing court-martial proceedings and to protect SSgt CM because "their toxic,

---

[6] Before the Facebook post, on 10 May 2017, Lt Col MS offered nonjudicial punishment to Appellant under Article 15, UCMJ, 10 U.S.C. § 815, for allegedly violating the second no-contact order on divers occasions. Appellant declined nonjudicial punishment and demanded trial by court-martial.

[7] Lt Col MS expanded the order to include ten named individuals for the preservation of good order and discipline of his unit.

[8] Lt Col MS preferred the original charges on 7 June 2017. Although those charges were subsequently withdrawn and dismissed by the convening authority on 1 August 2017, he preferred charges anew on 14 August 2017; an additional charge was preferred on 28 September 2017, and a second additional charge was preferred on 6 November 2017.

violent relationship was affecting the good order and discipline in the unit." Among the considerations in reissuing the orders was that Lt Col MS became aware of a reason SSgt CM gave to co-workers for continuing to violate reciprocal orders he gave to SSgt CM to refrain from all communication and contact with Appellant. SSgt CM told others she felt that she had no choice but to violate Lt Col MS's orders: "I have to stay with [Appellant]. I have to violate the orders, because my life is more important." Lt Col MS believed that continuing the reciprocal orders would mitigate the violence in their relationship.

Appellant acknowledged receipt and understanding of each order.

**2. Law**

We review de novo the lawfulness of a military order. *United States v. New*, 55 M.J. 95, 106 (C.A.A.F. 2001) (citation omitted). The critical "attributes of a lawful order include: (1) issuance by competent authority—a person authorized by applicable law to give such an order; (2) communication of words that express a specific mandate to do or not do a specific act; and (3) relationship of the mandate to a military duty." *United States v. Deisher*, 61 M.J. 313, 317 (C.A.A.F. 2005) (citations omitted).

Orders are presumed to be lawful, and an appellant bears the burden of demonstrating otherwise. *New*, 55 M.J. at 106 (citation omitted); *United States v. Hughley*, 46 M.J. 152, 154 (C.A.A.F. 1997) (citations omitted). Thus, "a subordinate disobeys an order at his own peril," though they may challenge the lawfulness of the order when it is given or in later proceedings. *United States v. Kisala*, 64 M.J. 50, 52 (C.A.A.F. 2006) (footnotes omitted). Our evaluation of the lawfulness of an order includes consideration of the criteria from the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 14.c.(2)(a)(iv), which states as follows:

> *Relationship to military duty*. The order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service. The order may not, without such a valid military purpose, interfere with private rights or personal affairs. However, the dictates of a person's conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order. Disobedience of an order which has for its sole object the attainment of some private end, or which is given for the sole purpose of increasing the penalty for an offense which it is expected the accused may commit, is not punishable under this article.

To be presumed lawful, an order must also be clear, specific, and narrowly drawn. *United States v. Moore*, 58 M.J. 466, 468 (C.A.A.F. 2003) (citing *United States v. Womack*, 29 M.J. 88, 90 (C.M.A. 1989)).

### 3. Analysis

At the outset, we reject Appellant's assertion at trial that Lt Col MS was without authority to issue the six no-contact orders Appellant was convicted of violating without first obtaining Appellant's and SSgt CM's consent.[9] We find no authority for this assertion and Appellant cites none. So long as a commander relies on a "valid military purpose" in issuing an unambiguous no-contact order that is narrowly drawn, any consequential "interfere[nce] with private rights or personal affairs" is nonetheless lawful without more. *MCM*, pt. IV, ¶ 14.c.(2)(a)(iv); *see also Moore*, 58 M.J. at 467–68.

On appeal, Appellant does not contest whether the six orders were issued by a competent authority or if they were sufficiently clear, specific, or narrowly drawn, *see Moore*, 58 M.J. at 468 (citing *Womack*, 29 M.J. at 90). Rather, Appellant claims the orders served no valid military purpose because Lt Col MS's justification for issuing the orders was inadequate. To this end, Appellant gives three bases for challenging lawfulness: (1) the orders appear to have been based on Lt Col MS's dislike for the relationship between Appellant and SSgt CM, and a paternalistic belief that he knew what was best for SSgt CM; (2) "assuming arguendo that the altercation in February was a sufficient military purpose to justify the initial no-contact order, that justification dissipated quickly. Lt Col MS could point to no other acts of violence between Appellant and SSgt CM that occurred after February 2017;" and (3) the only purpose of the orders was to enhance Appellant's punitive exposure. We consider each contention in turn including an examination of "the conduct at issue." *United States v. Padgett*, 48 M.J. 273, 278 (C.A.A.F. 1998) (citing *Womack*, 29 M.J. at 91); *see generally Moore*, 58 M.J. at 468 (focusing on the "specific conduct at issue in the context of the purposes and language of the order").

As to Appellant's first contention, Lt Col MS's orders directed Appellant not to contact, communicate, or interact in any way with SSgt CM. As found by the military judge, each order "was thought out and thoughtful as to purpose and its parameters." The military judge also found that Lt Col MS sought to ensure that Appellant did not tamper with or improperly influence SSgt CM, and thus the orders were "connected or related to military duty." We find the

---

[9] The military judge asked defense counsel if it was "the [D]efense's position that the commander was required to ask [Appellant] and/or [SSgt CM] whether or not they wanted a no-contact order?" Defense counsel replied it was "[i]f he's going to interfere with their personal rights."

military judge's factfinding was not clearly erroneous. Thus, we decline to accept Appellant's contrary assertions that Lt Col MS's purpose in issuing the orders was his dislike of Appellant's relationship with SSgt CM or Lt Col MS being unduly protective of what he thought was in SSgt CM's best interests. Lt Col MS was clear that it was not the relationship he disapproved of; rather, "[w]hat [he] disapprove[d] of [wa]s the violence in their relationship" and he "never interfered with their relationship . . . until [he] . . . was made aware of violence."

The evidence of record demonstrates Lt Col MS genuinely sought to prevent harm to SSgt CM and issued the series of orders to protect her safety,[10] *see Padgett*, 48 M.J. at 278 (upholding order intended to protect individuals from servicemember), as well as for the good order and discipline of his unit. He also sought to safeguard the ongoing investigation of Appellant. *See United States v. Nieves*, 44 M.J. 96, 99 (C.A.A.F. 1996) (citation omitted) (declining to find an order prohibiting discussions with witnesses unlawful, in part because there was "no evidence that appellant ever requested permission to interview [a witness] or that such permission was denied"). Lt Col MS stated that he had a concern about Appellant contacting witnesses to threaten them or to influence their testimony. This was a valid concern, and was also related to Lt Col MS's duty to maintain good order and discipline in his unit.

As to Appellant's second contention, Lt Col MS believed the no-contact orders reduced the level of violence between Appellant and SSgt CM even as he suspected Appellant of violating his orders. He also continued the orders, expanding them to apply to other named individuals, out of concern that Appellant would contact SSgt CM and witnesses to threaten them or influence their testimony. As the investigation of Appellant proceeded, Lt Col MS's reasons for issuing the orders did not diminish. Under the circumstances, we conclude the commander possessed a valid military purpose for issuing the series of no-contact orders.

Lastly, we reject Appellant's third contention—that the only purpose of the orders was to enhance Appellant's punitive exposure because contacting witnesses to influence an investigation is already prohibited by the UCMJ—as contrary to the military judge's findings of fact. We recognize the "ultimate offense doctrine" prohibits "the escalation in severity of minor offenses 'by charging them as violations of orders or the willful disobedience of superiors.'" *United States v. Phillips*, 74 M.J. 20, 22 (C.A.A.F. 2015) (quoting *United States v. Hargrove*, 51 M.J. 408, 409 (C.A.A.F. 1999)). Our superior court has similarly

---

[10] Lt Col MS explained there were "many reasons for the no-contact orders," "[o]ne of them to protect [SSgt CM]." One of the commander's concerns he related to SSgt CM early on was that he "d[id]n't want to have a funeral in [his] unit."

interpreted this doctrine to prohibit commanders from ordering a member to "follow the law" and to then punish the member for both the underlying criminal offense and the failure to follow the order. *See Padgett*, 48 M.J. at 278. However, Appellant was not charged with both obstruction of justice and the violation of a no-contact order. Thus, we find no reason to conclude that Lt Col MS issued no-contact orders to increase Appellant's punitive exposure.

## B. Self-Defense and Defense of Property

Appellant contends the military judge erred by failing to consider the possibility that Appellant acted in self-defense and that the evidence raised defense of property when Appellant committed the offense of assault consummated by a battery against SSgt AG.[11] Appellant claims the military judge was required to instruct on self-defense because there was evidence Appellant's contact with SSgt AG was a response to SSgt AG's use of force against Appellant. Appellant also claims the military judge was required to instruct, *sua sponte*, on defense of property because there was evidence the conduct in issue was a result of Appellant's attempt to lawfully remove trespassers from his home.

### 1. Additional Background

#### a. Thanksgiving Day

SSgt CM shared an off-base residence with Appellant and his children. In November of 2016, SSgt CM invited Airmen from her flight to her home for Thanksgiving dinner. Among the invited guests were SSgt AG, Senior Airman (SrA) JT, and SrA KJ, who testified at trial about an incident between Appellant and SSgt AG after dinner. Appellant was working a swing shift and was not at the apartment when guests arrived. When Appellant returned home at around 2300 hours, he changed his clothes and, according to SSgt AG, told her guests to "get the hell out of my crib." Appellant turned off the music and everyone began to leave. Appellant began cursing the Airmen, calling them "pu[**]ies," and claiming "you guys are just waiting to f[**]k my girl," in reference to SSgt CM.

SSgt AG testified he saw a "glare come across [Appellant's] face" the moment Appellant entered the residence. Appellant aired "frustration" that others were in his home, and his voice was loud enough to "mean[ ] business." As others were making their way out, SSgt AG stayed back because he was one of the more senior-ranking Airmen and he wanted to make sure all of the other guests left first, including one of his troops, SrA JT, who was standing "right by the doorway." As SrA JT was "about to leave" by crossing "the door seal or

---

[11] As charged in Specification 2 of Charge II, Appellant did "unlawfully strangle [SSgt AG] by grabbing his throat with his hand."

the doorway," Appellant was yelling at SrA JT and "went charging right after him" with a movement that SSgt AG described "was like a really brisk walk in [SrA JT's] direction," and Appellant's "hands were up" in the air. SSgt AG "stepped in between the two of them" and "was able to cut [Appellant] off right by the doorway." SSgt AG intervened to prevent a fight as he knew there was a long history of "bad blood" between Appellant and SrA JT.

SSgt AG further testified that as soon as he was between the two, Appellant's "right hand immediately went straight toward [SSgt AG's] throat and [Appellant's] left hand went towards [SSgt AG's] right arm to try and move [SSgt AG] out of the way." Appellant's grip on his throat "started getting tighter and tighter" as SSgt AG told Appellant to "relax" and "let go." Appellant's children were by the door and pleaded with Appellant to stop. SSgt AG stayed between Appellant and SrA JT, but as Appellant's grip got tighter it was harder for him to breathe, and he knew he was "going to pass out" if he did not push back. He "decided to keep trying to push [Appellant] back into the household," and as soon as he did, Appellant's focus changed from SrA JT to SSgt CM, and Appellant let go of SSgt AG's throat. SSgt AG departed after SrA JT and was the last guest to leave.

SrA JT[12] testified the Thanksgiving dinner party was a "family" setting that ended the moment Appellant arrived home from his shift. While Appellant and SSgt CM spoke in private, the guests looked at each other and asked if anyone knew "[w]hat's going on?" They wondered if they had offended Appellant and did not know what to do. Eventually, Appellant came out of a room and told SrA JT to "get the F out of [Appellant's] house." SrA JT understood the demand was addressed to him personally, but all of the flight members began leaving as SrA JT put on his hat and started making his way to the door. Appellant followed and SrA JT was "[r]ight outside the doorway" when he saw SSgt AG and a second guest "kind of holding [Appellant] back, stopping [Appellant] from coming towards" SrA JT who at that point was "already outside." SrA JT observed Appellant flailing his left arm "up and down" but did not observe Appellant choking SSgt AG.

Lastly, SrA KJ testified. She was among seven or eight Airmen from her flight whom SSgt CM invited to Thanksgiving dinner. SrA KJ was standing on a balcony outside the living area when Appellant arrived home. When she came back inside she noticed the mood of the party had changed for the worse. Appellant and SrA JT "started arguing with each other" and "the situation got kind of heated, and everyone started to walk out." Appellant was "looking directly at" SrA JT, using profanity, and speaking in an angry tone of voice. SrA

---

[12] SrA JT had separated from the military when he testified.

KJ was one of the first to leave. SrA JT "was walking out as well" when Appellant "charged toward" SrA JT with his hands raised. She observed SSgt AG get between Appellant and SrA JT to try to calm Appellant down and prevent harm to SrA JT and further escalation of the situation. From her vantage of about 20 to 30 feet outside the residence she looked back and saw SSgt AG holding back Appellant and the contact she witnessed lasted a matter of seconds. She did not see Appellant choking SSgt AG, but heard SSgt AG repeating in disbelief, "I can't believe [Appellant] choked me. [Appellant] choked me."

### b. Trial

The evidence at trial did not touch on Appellant's and SSgt CM's property rights or, more generally, their respective legal interests in the residence they shared on Thanksgiving Day in 2016 when Appellant cast out SSgt CM's guests. There was no testimony as to any verbal agreement, custom, or practice about the presence of guests in their home. However, in her trial testimony about violating their commander's no-contact orders by remaining in the same residence four months later, on 22 March 2016, SSgt CM explained "[w]e both had our names on the lease, [and] it was both of our apartment." Lt Col MS testified in findings that he was aware their lease expired on or about June 2017, but his testimony did not address when the lease began, its terms, or who was bound by the lease contract on Thanksgiving in 2016.[13]

After the close of evidence, the military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session with the parties and listed instructions she thought were raised by the evidence. The military judge acknowledged "there has been a great deal of discussion as to self-defense," but defense of property was not among the instructions she identified. The military judge asked counsel for both parties if they had "[a]ny objections right now to those [instructions] as outlined," noting counsel would have an opportunity to read her proposed instructions and make objections later. Defense counsel replied, "Not at this time, Your Honor." Later in the session the military judge asked counsel for both parties if there were "[a]ny other instructions" they wanted. Defense counsel mentioned only an unrelated instruction that no adverse inference should be drawn from Appellant's pretrial confinement status when he was alleged to have violated one of the orders. After a short discussion, the military judge asked if there were "[a]ny additional special instructions, Defense Counsel?" who replied, "Not at this moment, Your Honor, thank you."

---

[13] Although not admitted in findings, pages of a lease contract were included as attachments to Appellate Exhibits III and IV. The lease identified both SSgt CM and Appellant as tenants for the term 25 June 2016 through 25 June 2017.

Before instructing the members, counsel for both parties reviewed the military judge's proposed instructions in another Article 39(a), UCMJ, session. Defense counsel asked for an instruction on "self-defense of others" that impacted a specification for which Appellant would be acquitted, but did not raise defense of property to the specification at issue. At the end of the session, the military judge asked, "Anything else, Defense?" and the defense counsel replied, "Nothing additional, Your Honor." At the end of the session after a brief discussion about answering a member's question, the military judge asked if there was "[a]nything else we need to take up in this [Article] 39(a), [UCMJ, session]," and defense counsel replied, "No, Your Honor."

After the military judge instructed the members on the law, and prior to argument, defense counsel asked for an Article 39(a), UCMJ, session and the members left the courtroom. During the session, and for the first time on the record, the Defense requested the military judge instruct on self-defense for the Thanksgiving incident; however, the Defense did not also request a defense of property instruction. The military judge denied the request for the self-defense instruction, the members were seated, and counsel for both parties presented argument.

At the conclusion of argument, the military judge instructed the members on the procedural rules for their deliberations and voting, and then asked whether "[c]ounsel object to the instructions given or request additional [instruction]?" Defense counsel replied, "No, Your Honor." The military judge recessed the court for the evening. The next morning, the military judge gave a copy of her instructions to each member and closed the court for deliberations and voting on findings.

**2. Law**

"Whether a panel was properly instructed is a question of law reviewed de novo." *United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F. 2011) (citation omitted). "A military judge must instruct members on any affirmative defense that is 'in issue.'" *United States v. Schumacher*, 70 M.J. 387, 389 (C.A.A.F. 2011) (quoting Rule for Courts-Martial (R.C.M.) 920(e)(3)). An affirmative defense is "'in issue' when 'some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose.'" *Id.* (quoting *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)). The *Schumacher* court explained "'some evidence' entitling an accused to an instruction, has not been presented until 'there exists evidence sufficient for a reasonable jury to find in [the accused's] favor.'" 70 M.J. at 389 (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)).

### a. Self-Defense

Self-defense is an affirmative defense to a charge of assault consummated by a battery, *see generally* R.C.M. 916(a) and Discussion, and has two elements. First, the accused must have "[a]pprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully on" him; and second, the accused must have believed that the force used was "necessary for protection against bodily harm" and "that the force used by the accused was less than force reasonably likely to produce death or grievous bodily harm." *See* R.C.M. 916(e)(3); *see also United States v. Yanger*, 67 M.J. 56, 57 (C.A.A.F. 2008). Because the defense involves more than one element of proof, the record must contain some evidence upon which members could reasonably rely to find each element before the military judge is required to instruct the members on it. *Schumacher*, 70 M.J. at 389–90.

The right to self-defense is not available to an accused who "was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." R.C.M. 916(e)(4). However, an accused who starts an affray is entitled to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *United States v. Dearing*, 63 M.J. 478, 484 n.24 (C.A.A.F. 2006) (citations omitted).

### b. Defense of Property

Defense of property is also an affirmative defense to a charge of assault consummated by a battery, although "it is more accurate to refer to defense of property as a 'special defense,' and that the prosecution continuously bears 'the burden of proving beyond a reasonable doubt that the defense did not exist.'"[14] *United States v. Davis*, 73 M.J. 268, 271 n.3 (C.A.A.F. 2014) (quoting R.C.M. 916(b)(1)). Among the means by which an accused may lawfully defend his property, an accused has a right to eject a trespasser. *Id.* at 271–72. However, the right is circumscribed as an

> accused may only use as much force as is reasonably necessary to remove an individual from his property after requesting that the individual leave and then allowing a reasonable amount of time for the individual to leave. A person or invitee who refuses to leave after being rightfully asked to do so becomes a trespasser and may not resist if only reasonable force is employed in

---

[14] Although the defense supposes an accused has a legal right to defend the property at issue, whether real or personal, it is not among the defenses that R.C.M. 701(b)(2) requires notice to the Government before the beginning of trial.

ejecting him. However, a property owner may not purposely pro-
voke a disturbance on his property and then use his ownership
of the property as an excuse for an unnecessary assault in eject-
ing another person. If more force is used than is reasonably nec-
essary to remove a trespasser, this force constitutes assault and
battery.

*Id.* at 272 (citing *United States v. Regalado*, 33 C.M.R. 12, 14 (C.M.A. 1963))
(additional citations and internal quotation marks omitted). A military judge
has a duty to *sua sponte* instruct on the defense of property when "some evi-
dence, without regard to its source or credibility, has been admitted upon
which members might rely if they choose." *Id.* (quoting R.C.M. 920(e), Discus-
sion).

### c. Waiver

"Whether an appellant has waived an issue is a legal question that this
Court reviews de novo." *United States v. Rich*, ___ M.J. ___, No. 19-0425, 2020
CAAF LEXIS 240, at *8 (C.A.A.F. 28 Apr. 2020) (citing *United States v. Davis*,
79 M.J. 329, 332 (C.A.A.F. 2020)). In *United States v. Gutierrez*, the Court of
Appeals for the Armed Forces (CAAF) rejected plain error review of a required
instruction under R.C.M. 920(e)(3), observing that its "jurisprudence allows af-
firmative waiver of affirmative defenses." 64 M.J. 374, 376 n.3 (C.A.A.F. 2007).
The trial judge in *Gutierrez* stated "there doesn't appear to be any mistake of
fact instruction with regard to battery," and then pointedly asked the Defense,
"Are you requesting one?" *Id.* at 376. The court found waiver in defense coun-
sel's equally pointed response, "I simply do not want to request one for the
battery." *Id.* The *Gutierrez* court explained, "In making waiver determinations,
we look to the record to see if the statements signify that there was a 'purpose-
ful decision' at play." *Id.* at 377 (citing *United States v. Smith*, 50 M.J. 451, 456
(C.A.A.F. 1999)). The court found waiver, reasoning, "[d]efense counsel was
presented with the opportunity to request or decline the mistake of fact in-
struction as to assault consummated by battery. He chose to decline it, and in
doing so he affirmatively waived his right to the instruction." *Id.* at 377–78.

In *Davis*, the CAAF again rejected plain error review of a findings instruc-
tion. 79 M.J. at 332. The *Davis* court found waiver when an appellant argued
for the first time on appeal that the mens rea of "knowingly" applies to the
consent element of Article 120c.(a)(2), UCMJ, 10 U.S.C. § 920c.(a)(2). *Davis*, 79
M.J. at 331–32. At trial, before instructing the members, the military judge
identified the instructions he intended to give including the consent element
that the appellant raised as an issue on appeal. *Id.* at 330. After instructing
the members, the military judge "asked whether the defense had any objections
or requests for additional instructions," and the defense counsel replied, "No

changes, sir." *Id.* After marking his written instructions as an appellate exhibit, the military judge again asked if there were any objections, and the defense counsel replied, "No, Your Honor." *Id.* The *Davis* court found, "By expressly and unequivocally acquiescing to the military judge's instructions, Appellant waived all objections to the instructions, including in regards to the elements of the offense." *Id.* at 331 (citations and internal quotation marks omitted).

In *Rich*, the CAAF again found waiver of a mistake of fact defense instruction as the court had found in *Gutierrez*, explaining "when counsel affirmatively decline[s] to object and offer[s] no additional instructions, counsel expressly and unequivocally acquiesce[s] to the military judge's instructions, and his actions thus constitute waiver." *Rich*, 2020 CAAF LEXIS 240, at *9 (alterations in original) (internal quotation marks omitted) (citing *Davis*, 79 M.J. at 332). In *Davis*, the CAAF observed, "[W]hile we review forfeited issues for plain error, 'we cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal.'" *Davis*, 79 M.J. at 331 (quoting *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)). Nonetheless, pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c), the Courts of Criminal Appeals have the unique statutory responsibility to affirm only so much of the sentence that is correct and "should be approved." Thus, we retain the authority to address errors raised for the first time on appeal despite waiver at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted) (addressing this court's responsibility to "assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error").

### 3. Analysis

#### a. Self-Defense

Although the three witnesses testified somewhat differently, the rapid onset of violence at the Thanksgiving party is uncomplicated and the essential facts are not open to question. Appellant charged toward SrA JT[15] who was a guest in the home Appellant and his three children shared with SSgt CM. SrA JT's presence, and possibly the presence of others, stirred Appellant's anger, but there is no evidence of any particular words SrA JT uttered or conduct SrA JT engaged in that might cause Appellant to apprehend, upon reasonable

---

[15] Appellant was not charged with assaulting SrA JT. "An 'assault' is an attempt or offer with unlawful force or violence to do bodily harm to another, whether or not the attempt or offer is consummated. It must be done without legal justification or excuse and without the lawful consent of the person affected." *MCM*, pt. IV, ¶ 54.c.(1)(a).

grounds, that bodily harm was about to be inflicted wrongfully on Appellant, as might raise the defense of self-defense. R.C.M. 916(e)(3)(A).

Appellant alludes to SrA KJ's testimony that Appellant and SrA JT "started arguing with each other" and "the situation got kind of heated." However, Appellant cites no authority, and we are aware of none, that justifies a resort to violence and entitles an aggressor to a self-defense instruction from an argument in which the words that were exchanged, by whom, and the background or context are not evident from the record. Considering SrA KT's testimony alone or with the testimony of other witnesses, there is no evidence SrA JT manifested any threat of attack or intent to start a fight. There was no evidence upon which members might rely to find that either SSgt AG or SrA JT, and not Appellant, started the affray. *See Schumacher*, 70 M.J. at 389. It follows that SSgt AG's intervention and physical contact with Appellant when he came to SrA JT's defense was in every respect a response to an unjustified attack.[16] Appellant had no right to self-defense when he rushed at SrA JT because the uncontradicted evidence at trial was that Appellant was the initial, unprovoked aggressor. R.C.M. 916(e)(4).

As SSgt AG stepped between Appellant and SrA JT, and Appellant then made contact with SSgt AG's body, Appellant's assault consummated in battery.[17] SSgt AG was legally justified to defend both himself, R.C.M. 916(e)(3), and SrA JT, R.C.M. 916(e)(5), with force necessary for protection against bodily harm under the principles of self-defense and defense of another. Only if SSgt AG used unlawful force, and thereby escalated the level of the conflict, would Appellant then be justified to use force to defend against the escalation. *See generally Dearing*, 63 M.J. at 484 n.24 (citing *United States v. Cardwell*, 15 M.J. 124, 126 (C.M.A. 1983)). This is so because "[e]ven a person who starts an affray is entitled to use self-defense when the opposing party escalates the level of the conflict." *Cardwell*, 15 M.J. at 126 (citing *United States v. Acosta-Vargas*, 32 C.M.R. 388 (C.M.A. 1962); *United States v. Straub*, 30 C.M.R. 156 (C.M.A. 1961)) ("The theory of self-defense is protection and not aggression, and to keep the two in rough balance the force to repel should approximate the violence threatened.").

---

[16] A bystander acts at his own peril when he "goes to the aid of an apparent assault victim" because he assumes the legal status of the defended person. R.C.M. 916(e)(5), Discussion. If, unbeknownst to the bystander, the apparent victim was in fact the aggressor, the bystander has no right to self-defense. *Id.* In the instant case, as discussed, there is no evidence on which a rational factfinder could conclude SrA JT was an aggressor or a provocateur.

[17] "A 'battery' is an assault in which the attempt or offer to do bodily harm is consummated by the infliction of that harm." *MCM*, pt. IV, ¶ 54.c.(2)(a).

Appellant was entitled to a self-defense instruction tailored to include the principle of escalation of force if there was "some evidence" in the record which the members could rely upon that placed escalation in issue. *United States v. Stanley*, 71 M.J. 60, 63–64 (C.A.A.F. 2012) (failure to instruct on the principle of escalation of force was not error because the record lacked any evidence that would trigger a duty to instruct). In the instant case, it was Appellant who abruptly escalated the level of force in the conflict and intensified the violence by immediately grabbing SSgt AG's throat and using Appellant's own power and strength to try to force his way around SSgt AG and threaten harm to SrA JT. While SSgt AG overcame Appellant's force by holding Appellant back and stopping Appellant from reaching SrA JT, there is no evidence SSgt AG escalated his use of force beyond that which was necessary to fend off Appellant's continued unlawful assault and battery. In particular, Appellant's strangling SSgt AG at the same time Appellant continued to manifest unprovoked aggression toward SrA JT was unnecessary for his own defense. *See, e.g.*, *United States v. Ginn*, 4 C.M.R. 45, 50 (C.M.A. 1952) ("Self-defense is a defensive, not an offensive act; and it cannot exceed the bounds of mere protection of one's self.").

We find the issue of self-defense was not reasonably raised by the evidence, *see Schumacher*, 70 M.J. at 389–90, and the military judge did not err in declining to instruct the members on self-defense or give a tailored instruction that included the principle of escalation of force in self-defense.

### b. Defense of Property

Appellant also claims the military judge was required to instruct, *sua sponte*, on defense of property as a defense to Appellant strangling SSgt AG. The law recognizes that "individuals may protect their place of abode against unlawful intrusion. When one with the right to do so has ordered another from the premises, the latter has no right to refuse or resist." *Regalado*, 33 C.M.R. at 15 (citing *United States v Adams*, 18 C.M.R. 187, 194 (C.M.A. 1955) (appellant occupying government tent had right to protect himself from trespasser); *United States v Berry*, 20 C.M.R. 354 (C.M.A. 1956)).

We find Appellant affirmatively waived a defense of property instruction. We reach this conclusion from defense counsel's discussions with the military judge in three Article 39(a), UCMJ, sessions held to discuss proposed findings instructions. Considered together, these sessions included a discussion of applicable defenses to include self-defense as a complete defense to the specification at issue. In each session, defense counsel neither objected nor requested a defense of property instruction. After the conclusion of the findings arguments, the military judge again asked if the Defense had any objections or requests for additional instructions. The Defense replied it had no objections to the instructions as given, and did not request any additional instructions.

On these facts, Appellant expressly and unequivocally acquiesced to findings instructions that did not include the defense of property instruction Appellant claims should have been given. *See Davis*, 79 M.J. at 332 (citing *United States v. Wall*, 349 F.3d 18, 24 (1st Cir. 2003) ("[C]ounsel twice confirmed upon inquiry from the judge that he had 'no objection and no additional requests [regarding the instructions].' Having directly bypassed an offered opportunity to challenge and perhaps modify the instructions, appellant waived any right to object to them on appeal." (alteration in original))). Appellant thus waived the objection he raises on appeal.

We find no reason to pierce Appellant's waiver in this case, *see Hardy*, 77 M.J. at 442–43; *see also Chin*, 75 M.J. at 223, because the military judge committed no error. Appellant's claim supposes he had a right to an instruction that he could oust SSgt CM's guests from their shared residence.[18] However, Appellant points to no evidence at trial upon which members might have relied to find Appellant had a right he asserts for the first time on appeal. Appellant's lease was not admitted in evidence. No evidence suggests Appellant's property rights under Colorado law were superior to SSgt CM's own, that Appellant was at liberty to force SSgt CM's guests to leave, or that SSgt CM acceded to the removal of her guests on Appellant's terms.

Even if we were to assume Appellant had the requisite property rights and legal interest to demand SSgt CM's guests leave their shared residence, the evidence does not suggest that Appellant gave them reasonably adequate time to comply and that Appellant used no more force than was reasonably necessary. Instead, the evidence indicates Appellant did what the law disallows: he "purposely provoke[d] a disturbance on his property and then use[d] his ownership of the property as an excuse for an unnecessary assault in ejecting another person." *Davis*, 73 M.J. at 272. Defense of property simply was not in issue given the facts of this case and the military judge did not err in failing to *sua sponte* instruct the members that it was.

## C. Allegation of Unlawful Command Influence

Appellant renews his claim at trial that over a year before Appellant's court-martial, Lt Col MS orchestrated a commander's call message to discourage Appellant's coworkers from providing character letters or testifying on Ap-

---

[18] Appellant's claim is, to some extent, contrary to the position taken by the civilian defense counsel who argued in findings that Appellant and SSgt CM "lived together," "were on a lease together," and "they *both have rightful legal access* to that property." (Emphasis added).

pellant's behalf. Appellant requests this court set aside and dismiss the findings and sentence on the basis of apparent UCI in the adjudicative stage of his court-martial.

### 1. Additional Background

Lt Col MS released Appellant from pretrial confinement on 1 August 2017 after the convening authority withdrew and dismissed Appellant's original charges, and before Lt Col MS preferred charges anew on 14 August 2017. A week earlier, on 7 August 2017, and just over a year before Appellant's trial and sentencing, Lt Col MS held a commander's call as was his practice every six months. The topics covered at the commander's call included military awards and recognition, civilian achievements, sexual assault, and NCOs behaving poorly and making bad decisions.[19]

Lt Col MS encouraged the squadron to "support" Airmen, no matter what process or difficulty the Airman may be going through, but not "enable" bad behavior. He also addressed the impropriety of spreading rumors, stating metaphorically, "You guys may know what your friends are telling you, but you don't have the big picture," and that there was "more than one chapter in the book." He testified,

> My goal was to get NCOs to start acting like NCOs, and other NCOs who were holding the line, to call the other NCOs out. They should be embarrassed when their NCOs are acting a certain way and giving their corps a bad name. Just like we get embarrassed when officers misbehave.

Lt Col MS told a story from when he was enlisted and a junior Airman under his supervision asked him to provide a character letter. The Airman was undergoing nonjudicial punishment proceedings for breaking curfew in a deployed location. At the commander's call, Lt Col MS explained why he declined, reasoning that the Airman not only disobeyed the order of the mission commander, but Lt Col MS had looked the Airman in the eye and told him to make sure he was back on time. Lt Col MS related he was there to support the Airman but that he could not write a letter advocating that his commander not take a stripe over the good order and discipline of the unit. Lt Col MS explained at the commander's call about his "commitment to the Air Force" then, noting his commander at the time would question Lt Col MS's judgment if Lt Col MS signed a letter advocating that the commander not take a stripe.

---

[19] Lt Col MS addressed the squadron, and afterwards the senior NCOs separately addressed the NCOs to reinforce the commander's message and answer questions. Appellant was not in attendance at the commander's call or the meeting of NCOs.

Lt Col MS's comments did not mention anyone by name or reference allegations or incidents of misconduct in the unit. Even so, his remarks were prompted by knowledge of issues involving Appellant and SSgt CM, and other NCOs in the squadron. Lt Col MS was aware that Appellant's friend, SSgt JP, had responded to Appellant's Facebook post with a message that Lt Col MS viewed as a continuation of Appellant's Facebook threat. The catalyst for making NCO behavior a topic of the commander's call was SSgt JP's reaction to Appellant's recent release from pretrial confinement at the same time the original charges that Lt Col MS had preferred against Appellant were withdrawn and dismissed by the convening authority. Lt Col MS testified he knew at the time of the convening authority's disposition he would prefer charges anew.[20] Around this time Lt Col MS learned from his NCOs that Appellant and SSgt CM continued to contact each other in violation of his orders, including during the time when Appellant was in pretrial confinement. He felt the squadron took a negative turn when charges were withdrawn and dismissed because the Airmen were wondering what was going on and had lost faith in the system.[21] Lt Col MS's remarks were prompted also by matters unrelated to Appellant, including that SSgt JP had been found in his vehicle outside a club with over twice the legal limit of alcohol in his blood, an NCO had operated a motorcycle in a manner that caused injury to a junior Airman who was a passenger, and several NCOs had recently failed their physical fitness assessments.

After the commander's call, a junior NCO[22] who was Appellant's friend asked to meet with the commander. Lt Col MS was aware that the NCO had previously given a statement to law enforcement stating he "thought that the unit and the Air Force were after [Appellant] and [Appellant] wasn't that bad." Lt Col MS met with the NCO who assured the commander he was friends with Appellant, but understood the commander's perspective and "everything that's

---

[20] Lt Col MS was concerned about the effect on his unit of SSgt JP "[w]alking around just talking real loud saying, 'My homey's getting released. He's getting out. We are going to throw a barbecue,'" with the implication that Appellant was in the clear. Lt Col MS was concerned also because two individuals around whom SSgt JP reveled in Appellant's seeming good fortune were individuals SSgt JP disliked and were witnesses in the Government's case. Lt Col MS believed SSgt JP knew they were witnesses because SSgt JP was friends with Appellant.

[21] Lt Col MS testified he knew of an instance of NCOs discussing Appellant's orders violations in front of a junior Airman. He explained, "When you are in command . . . [y]ou can feel your unit start to question and doubt what is going on. Why is leadership not taking care of things?" In response to the military judge's questions, he added, "A unit that had high morale and doing very well was starting to go flat."

[22] The junior NCO did not testify at the hearings. However, Lt Col MS testified about their conversations.

going on." Because the NCO was close friends with Appellant, Lt Col MS reinforced his expectation "to support [Appellant] when he needs something. Just do not enable him." Lt Col MS testified in general about other exchanges he had with the junior NCO in which the commander encouraged the NCO to contact Appellant's defense counsel because the NCO was not following through on returning calls by Appellant's defense counsel. Lt Col MS told him, "You call the defense" because "[t]hat's part of the process. You call them. They are going to interview you. All I ever expect anybody to do in this unit is just tell the truth." The squadron's first sergeant testified he was aware the junior NCO was visiting Appellant when Appellant was in pretrial confinement, and thanked him for supporting Appellant every time the first sergeant and the NCO talked.

Both the Defense and trial counsel called Airmen who were present for the commander's call to testify on the motion. The Defense called SSgt JP and a senior airman, both of whom understood the commander's message to be that those who support an NCO in trouble need to rethink their careers in the Air Force.[23] While SSgt JP initially understood that the commander's message was to not support Appellant, when he sought clarification from a senior NCO, he was told that the message was not about avoiding the Defense or withholding support for Appellant. Ultimately, SSgt JP did not believe the commander's message was to stay away from Appellant or avoid speaking with Appellant's defense counsel. Two senior NCOs testified they understood the commander's message to be to support, and not enable, Airmen in trouble. SSgt AG, who was later the victim of Appellant's assault consummated by a battery, also attended the commander's call. He understood the message to be: if you support certain individuals, you need to rethink your position in the Air Force. SSgt AG was confused by the message and believed Lt Col MS was not clear on what "support" meant. He believed the overall message was to rethink one's position in the Air Force so as not to follow a bad path. SSgt AG did not seek to clarify the message with anyone in his chain of command. Ultimately, he did not believe he would be punished for his testimony or that the commander threatened punishment if he supported troubled NCOs.

---

[23] The senior airman understood his commander's message to be "[i]f you're supporting an NCO that's in trouble, you might want to rethink your career. . . . [I]t might put you in a negative light . . . or you might be looked at as the problem, also." He testified he thought it might rub the commander the wrong way to write a character statement "because [Lt Col MS] never really made it clear what he meant by that statement, so he left a lot of room for imagination." He believed there would not be ramifications to his testimony on the motion because he intended to separate from active duty.

**2. Law**

"Allegations of unlawful command influence are reviewed de novo." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citations omitted). Where an assertion of unlawful command influence is litigated at trial, we review the military judge's findings of fact for clear error, but we review de novo the legal question whether those facts constitute unlawful command influence. *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F. 2000) (citing *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994)). "On appeal, the accused bears the initial burden of raising unlawful command influence." *Salyer*, 72 M.J. at 423.

"Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). Unlike actual UCI, a meritorious claim of an appearance of UCI does not require prejudice to an accused. *Boyce*, 76 M.J. at 248 (footnote omitted). "[W]hen an appellant asserts there was an appearance of unlawful command influence[,] [t]he appellant initially must show 'some evidence' that unlawful command influence occurred." *Id.* at 249 (quoting *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)) (additional citation omitted). This initial showing requires an accused to demonstrate:

> (a) facts, which if true, constitute unlawful command influence; and (b) this unlawful command influence placed an intolerable strain on the public's perception of the military justice system because an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.

*Id.* (internal quotation marks and citation omitted). Though the burden of this threshold showing on an accused is low, the evidence presented must consist of more than "mere allegation or speculation." *Salyer*, 72 M.J. at 423 (citation omitted).

"Once an appellant presents 'some evidence' of unlawful command influence, the burden then shifts to the government to . . . prov[e] beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence." *Boyce*, 76 M.J. at 249 (citing *Salyer*, 72 M.J. at 423) (additional citation omitted). If the Government fails to rebut the appellant's factual showing, it may still prevail if it proves "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant

doubt about the fairness of the proceeding.'" *Id.* at 249–50 (quoting *Salyer*, 72 M.J. at 423) (internal quotation marks omitted).

### 3. Analysis

The military judge found Appellant did not meet his threshold burden to demonstrate "some evidence" of UCI and denied the motion. *Boyce*, 76 M.J. at 249. On appeal, Appellant asserts the Defense did present "some evidence" of at least an appearance of UCI in three respects, specifically: (1) that Lt Col MS made comments about his "NCO problem" in large part because of Appellant's case; (2) that Lt Col MS attempted but failed to distinguish supporting Airmen from enabling Airmen; and (3) that Lt Col MS told the story about declining to provide a character letter for an Airman on deployment, because of the duty he felt to the Air Force and the negative consequences it could have had to his career. Appellant contends this evidence was a sufficient showing of apparent adjudicative UCI to shift the burden to the Government, which cannot prove beyond a reasonable doubt that the appearance did not create an intolerable strain on the public's perception of the fairness of the military justice system. Accordingly, Appellant urges us to set aside and dismiss the findings and sentence.

Although the record is unclear as to the exact words Lt Col MS spoke at the commander's call or the message that was conveyed, we find Appellant met his initial showing of "some evidence" of apparent UCI. *See Boyce*, 76 M.J. at 249. Even if we accept the military judge's factfinding that Lt Col MS did not orchestrate a message to discourage members of his squadron from providing character letters or testifying on Appellant's behalf as Appellant contends he did, there is no question Lt Col MS had Appellant in mind when he made his comments, and members of the squadron who knew Appellant well would recognize Appellant was among the Airmen who were the focus of his remarks. The commander's recitation of the personal story illustrated reasons not to provide a requested character statement for an Airman facing discipline that was heavy on repercussions and less so on providing information to assist with disposition and discipline of the offender. Lt Col MS knew he was going to reprefer charges on Appellant when he made his remarks.

Nonetheless, we conclude that the evidence of apparent UCI was rebutted by the Government's proof that there was no intolerable strain upon the public's perception of the military justice system beyond a reasonable doubt. The commander's call, held over a year before Appellant's trial, addressed multiple topics; one of which was NCO misconduct, which the commander spoke about in general terms without identifying either Appellant, the facts underlying the investigation of Appellant's misconduct, or repreferral of charges that would be forthcoming. While the commander told a personal story about refusing to write a character letter to an Airman who committed misconduct under his

supervision, importantly none of the witnesses testified that they understood his commander's call message as one discouraging them from writing character letters for Appellant.

Although charges were preferred one week after the commander's call, trial on the merits was not held until more than a year later. No members of the squadron testified that Lt Col MS would take any action against them for their participation in the court-martial, and there is no evidence in the record that any Airman refused to testify or write a character letter in support of Appellant for sentencing. There is no evidence that a witness once supportive of Appellant later withdrew or changed any assurance of support. We conclude these facts demonstrate that the Government met its burden to demonstrate beyond a reasonable doubt that no fully-informed, disinterested, objective observer would doubt the fairness of Appellant's court-martial. *Boyce*, 76 M.J. at 249–50 (citation omitted).

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court